Gary L. CATTIN and Thomas F. Omans (90–1016), Plaintiffs–Appellants/Cross–Appellees,

v.

GENERAL MOTORS CORPORATION (90–1051); Electronic Data Systems Corporation (90–1052), Defendants–Appellees/Cross–Appellants.

Nos. 90–1016, 90–1051 and 90–1052.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 22, 1991.

Decided Jan. 30, 1992.

Jules B. Olsman (argued and briefed), Woll, Crowley, Berman, Olsman & Nolan, Royal Oak, Mich., for plaintiffs-appellants/cross-appellees.

David M. Davis (argued and briefed), Terence V. Page (argued and briefed), Hardy, Lewis, Pollard & Page, Birmingham, Mich., for defendants-appellees/cross-appellants.

Before JONES and MILBURN, Circuit Judges, and ENGEL, Senior Circuit Judge.

MILBURN, Circuit Judge.

Plaintiffs Gary L. Cattin and Thomas F. Omans appeal a second time from the district court's judgment holding that they are not entitled to early retirement benefits. Defendants General Motors Corporation ("GM") and Electronic Data Systems Corporation ("EDS") cross-appeal from the district court's ruling that plaintiffs are allowed to participate in a Stock Incentive Plan.

For the purpose of clarity, we have restated the five issues raised in this appeal by the plaintiffs as follows: (1) whether the Retirement Equity Act of 1984, amending 29 U.S.C. § 1054(g)(2)(A) and (B), prevented GM from amending its retirement program to eliminate the rights of plaintiffs to accrue credit under certain early retirement provisions of the GM retirement program; (2) whether recent amendments to the Internal Revenue Code, specifically 26 U.S.C. § 411(d), prohibited GM from altering its retirement plan to plaintiffs' detriment; (3) whether the district court erred in holding that plaintiffs had no contractual right to participate in GM's early retirement program; (4) whether the trial court erred in holding that a Closing Agreement issued by the Internal Revenue Service in this case required no modification of the district court's prior decision of August 8, 1986; and (5) whether the trial court erred in denying plaintiffs' motion for attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

On their cross-appeal, defendants present three issues: (1) whether the district court erred in holding "unconscionable" a release of claim provision inserted by defendants in their offer to plaintiffs to participate in a Stock Incentive Plan; (2) whether the district court erred in granting plaintiffs relief under "General Equity" theories when such broad equitable claims were never before the court; and (3) whether the district court erred by failing to differentiate between equitable claims and equitable relief. For the reasons that follow, we affirm.

I.

A. Facts

Plaintiffs are former employees of GM who worked for over twenty-seven years in a data processing department at GM. On September 21, 1984, GM announced to its shareholders its intention to acquire EDS, a large data processing firm. According to the plan, EDS would assume responsibility for all GM data processing work and offer employment to data processing personnel of GM. The plan of merger provided that employees of EDS would not participate in GM's employee benefit plan, including the retirement plan, and that EDS employee benefit plans would remain in effect. After the GM shareholders approved the proposal, GM acquired EDS on October 18, 1984, and EDS became a wholly-owned subsidiary of GM.

Seven thousand GM employees employed in data processing were transferred to EDS on January 1, 1985. However, in order to resolve questions about these employees' retirement benefits, GM amended its retirement plan for salaried employees ("GM retirement plan") on October 1, 1984. The GM retirement plan, established in 1950, consists of two parts. Part A, derived from employer contributions, provides a monthly basic benefit equal to the years of credited service completed under the program multiplied by a basic benefit rate. For example, the monthly basic benefit rate payable for a retirement commencing in October 1986 for salaried employees, level five or above, equals years of credited service multiplied by $22.20. Thus, an employee who had completed twenty-seven years of credited service would have an entitlement of monthly basic benefits of twenty-seven multiplied by $22.20 or $599.40 per month.

Under the 1950 retirement plan, an employee could retire and receive benefits at or after the attainment of age fifty-five or after the completion of thirty years of credited service ("thirty-and-out"). Employees retiring after thirty years of service, but before they reached age sixty-two, would also receive under Part A of the program an early retirement supplement called the social security make up benefit ("social security supplement"). The social security supplement was designed to supplement employees' retirement benefits until they were eligible to receive social security. Although the Part A social security supplement generally was payable commencing at retirement and continuing until attainment of age sixty-two, it could be forfeited or reduced if the employee was discharged for cause, if the employee had earnings in excess of certain prescribed annual limitations, or if the employee became eligible for social security disability benefits. In any event, the social security supplement was to end at age sixty-two. Part B of the program provided a primary benefit, in addition to benefits under Part A, for those participants who elected to make monthly contributions to their retirement account.

Prior to October 1984, all benefits under the GM retirement plan were also extended to the employees of wholly-owned subsidiaries of GM. However, on October 1, 1984, GM amended its retirement plan pursuant to section 8A of the plan which states: "The Corporation reserves the right, by and through its Board of Directors, to amend, modify, suspend, or terminate the program in the future." The October 1, 1984, amendment excluded from the GM retirement plan "[e]mployees of any directly or indirectly wholly-owned or substantially wholly-owned subsidiary of the Corporation formed or acquired on or after March 1, 1984, unless specifically approved by the General Motors Corporation Board of Directors." The effect of this amendment was to preclude the employees who were transferring to EDS from accruing additional credited service under the GM retirement plan. Essentially, what the transferring employees lost was (1) the ability to continue to accrue credited service with GM while working with EDS and, therefore, the right to early retirement, and (2) the right to the social security supplements which would have been payable upon one's retirement after thirty years served while under sixty-two years of age.

The information regarding the changes to the GM retirement program was conveyed to the transferring employees in a booklet entitled "Statements of Your General Motors Benefits after Joining the New EDS." At a meeting on November 1, 1984, the transferring employees were also shown video tapes featuring various GM personnel who outlined the changes that would be made by the acquisition of EDS. In particular, they were informed as to the manner in which the transfer would affect their retirements. Employees having more than thirty years of service with GM were allowed to transfer to EDS or to retire with such benefits as they had accrued under the GM retirement plan. Employees in plaintiffs' position, who had not already qualified for retirement by working for thirty years, were told that upon transfer, their active participation in the GM retirement plan would cease. They would remain entitled to the accrued benefits of the

GM retirement plan based upon their years of credited service, and, as transferring employees, they were to be allowed immediate participation in the EDS benefit plan. In the event any GM employee refused to transfer to EDS, his or her employment with GM would be terminated.

As earlier stated, plaintiffs had worked for GM in the data processing department for over twenty-seven years when they were transferred to EDS. As their only alternative to the transfer to EDS was termination by GM, they elected to transfer. After the transfer, they were unable to qualify for and take advantage of GM's thirty-and-out early retirement program and the social security supplements payable under it.

Prior to their transfers on January 1, 1985, transferring employees, including the plaintiffs, were advised by defendants of a Stock Incentive Plan whereby they would be given the opportunity to purchase EDS stock at a "nominal price of 10 cents per share." Defendants never indicated in any way prior to plaintiffs' transfer to EDS that plaintiffs would be required to execute a release as a condition to their participation in the purchase of the stock. However, on February 15, 1985, when plaintiffs were provided with the opportunity to purchase the stock, the stock purchase agreement contained a release clause providing that the signer would give up any and all claims under state and federal law against GM and EDS for any matter arising out of the transfer, including but not limited to the claims set forth in plaintiffs' complaint. As stated, the release clause was never disclosed to plaintiffs until after their transfer to EDS. As both plaintiffs refused to sign the stock agreement because of the presence of the release clause, neither plaintiff was allowed to purchase the shares of stock specified in defendants' letters of November 12, 1984.

### B. Procedural History

Plaintiffs commenced this action in the district court on November 19, 1984. Plaintiffs initially challenged the loss of their early retirement benefits under the theory that such benefits were guaranteed to plaintiffs by GM and that the rights plaintiffs held were vested and non-forfeitable under 29 U.S.C. § 1053(a) of the Employee Retirement Income Security Act ("ERISA"). Plaintiffs also requested class certification pursuant to Federal Rule of Civil Procedure 23(b).

On May 2, 1985, after plaintiffs had been given an opportunity to sign the stock purchase agreement and had refused, plaintiffs amended their complaint to allege that they each had the right to participate in the Stock Incentive Plan arising out of contract and promissory estoppel theories. Plaintiffs also added a federal common law contract claim for early retirement under the GM retirement plan.

On April 25, 1985, defendant GM moved for summary judgment. EDS moved for summary judgment on May 1, 1985. On June 7, 1985, the district court granted defendant EDS' motion for summary judgment with respect to plaintiffs' claims alleging a right to early retirement benefits. Summary judgment was not granted as to the Stock Incentive Plan. On June 27, 1985, the district court granted defendant GM's motion for summary judgment regarding the 29 U.S.C. § 1053 claim,[1] but denied the motion with regard to plaintiffs' contract claim that alleged a right to early retirement benefits.

On October 1, 1985, the district court granted defendant EDS partial summary judgment as to plaintiffs' claim of a contractual entitlement to purchase stock under the Stock Incentive Plan. The district court held that while plaintiffs were not entitled to pursue their claims under a contract theory, they could proceed to trial under the theory of promissory estoppel. Thereafter, on October 31, 1985, the dis-

---

**1.** Plaintiffs have conceded that the non-forfeiture provision of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1053, did not prohibit GM from amending its retirement plan to eliminate their early retirement benefits, including the social security supplements.

trict court entered an order granting partial summary judgment against plaintiffs on their state claim of contractual entitlement to participate in the Stock Incentive Plan and also denied plaintiffs' request for class certification.

A bench trial commenced on July 7, 1986. At issue was whether plaintiffs were entitled to early retirement benefits on their contract and promissory estoppel theories. Also at issue was whether they had rights, arising out of equitable or promissory estoppel, to participate in the Stock Incentive Plan.

The district court, after noting that plaintiffs had waived their ERISA claim under 29 U.S.C. § 1053, held that plaintiffs had no contractual entitlement or entitlement under a theory of promissory estoppel to any early retirement benefits as GM had properly amended its retirement plan pursuant to section 8A of the plan. The district court also held that while plaintiffs were not entitled to participate in the Stock Incentive Plan under a promissory estoppel theory, they were entitled to participate on equitable grounds. On October 22, 1986, the district court entered final judgment pursuant to its opinion of August 8, 1986. 641 F.Supp. 591. Plaintiffs and defendants timely appealed to this court.

On November 25, 1986, plaintiffs filed a motion in the district court for relief from the final judgment pursuant to Federal Rule of Civil Procedure 60(b). Plaintiffs moved that the district court alter its prior ruling on the grounds that defendant GM had violated the Retirement Equity Act of 1984, amending 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6). On January 27, 1987, the district court dismissed the Rule 60(b) motion, ruling that the parties' pending appeals to this court had deprived it of jurisdiction.

In their original appeal, plaintiffs argued, among other things, that GM's amendment of the retirement plan violated 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6). During the pendency of the appeal, the parties brought to this court's attention the fact that on August 5, 1987, the Internal Revenue Service ("IRS") ques-

tioned the legality of GM's amended retirement plan under 26 U.S.C. § 411(d)(6). The IRS reopened its determination process and began a re-evaluation of the plan. This court, finding that the IRS re-evaluation could affect the rights of the parties, remanded the case for reconsideration by the district court upon the IRS's issuing its final determination.

On July 18, 1989, the IRS issued its determination with regard to the GM retirement plan, as amended, in the form of a Closing Agreement and Technical Advice Memorandum. The determination was that GM's amended retirement plan was not in violation of 26 U.S.C. § 411(d)(6). Plaintiffs then filed a motion for summary judgment on August 15, 1989, arguing that 26 U.S.C. § 411(d)(6) and 29 U.S.C. § 1054(g) prohibited GM's elimination of early retirement benefits. The district court rejected both arguments and overruled plaintiffs' motion for summary judgment on November 21, 1989.

On November 14, 1986, plaintiffs filed a motion for attorney's fees with the district court. Plaintiffs filed a supplemental motion on August 15, 1989, and the district court overruled plaintiffs' motions on November 27, 1989.

Finally, in the opinion dated November 21, 1989, the district court held that the IRS Closing Agreement and Technical Advice Memorandum did not affect its prior opinion of August 8, 1986, which the district court reaffirmed in its entirety. The district court entered judgment on December 11, 1989, reaffirming its prior judgment of October 22, 1986. Plaintiffs timely filed this appeal. Defendants timely appealed from that part of the district court's judgment awarding plaintiffs the right to participate in the Stock Incentive Plan on equitable grounds.

## II.

### A. Standard of Review

With the exception of the issue regarding attorney's fees, the issues addressed in this opinion are wholly legal in nature and will be reviewed de novo. *Whitney v. Brown,*

882 F.2d 1068, 1071 (6th Cir.1989); *Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304, 308 (6th Cir.1988), *cert. denied*, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988). The question concerning attorney fees is a matter of the district court's discretion, and we will review its decision only for an abuse of discretion. *Sweet v. Consolidated Aluminum Corp.*, 913 F.2d 268, 271 (6th Cir.1990).

## B. ERISA § 1054(g) and IRC § 411(d)

Plaintiffs argue that GM's amendment of its retirement plan violated 29 U.S.C. § 1054(g)(2)(A) and (B) and 26 U.S.C. § 411(d)(6), as amended by the Retirement Equity Act of 1984, because the amendment permitted plaintiffs' transfer to a GM subsidiary and provided that, after transfer, they could not continue to accrue the thirty years of service necessary to earn the benefits of the thirty-and-out retirement program, including the social security supplements payable in connection with early retirement.

At the outset, it is important to note that plaintiffs have conceded in their brief and at oral argument that they have now been offered the opportunity to retire after thirty years of combined service with GM and EDS pursuant to a March 1, 1990, amendment to GM's retirement plan. Because of GM's offer to give plaintiffs and other employees transferred to EDS the right to early retirement, plaintiffs request in their brief

> that this Court find that the social security supplement is a protected benefit and that the benefit be awarded to the appellant Gary Cattin retroactive to his date of retirement and that appellant Thomas Omans be able to retire when he chooses to do so and obtain the social security supplement plus all other accrued benefits under the General Motors Retirement Plan.

Plaintiffs' Brief Supplemental at 30. Plaintiff Cattin retired on August 1, 1990, and is currently receiving all the benefits he would have received had he retired from GM rather than EDS except for the social security supplement. Plaintiff Omans is eligible for early retirement. Thus, the only issue remaining as to retirement benefits is whether the right to the social security supplements, which plaintiffs would have received upon early retirement had they remained at GM, was taken from plaintiffs in violation of 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6). Plaintiffs' claims regarding the thirty-and-out program have been mooted by the action of GM in allowing plaintiffs to retire early after thirty years of combined service with GM and EDS. Cases may become moot pending appeal if the requested relief has been granted. *Deakins v. Monaghan*, 484 U.S. 193, 199, 108 S.Ct. 523, 528, 98 L.Ed.2d 529 (1988).

■ Plaintiffs' primary contention is that Congress amended 26 U.S.C. § 411(d)(6) and 29 U.S.C. § 1054(g) in order to protect early retirement benefits, including social security supplements of the type at issue in this case. Before 29 U.S.C. § 1054(g) was amended by the Retirement Equity Act of 1984 it provided:

> The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) of this title.

In the Retirement Equity Act of 1984, Congress added a second paragraph ("paragraph 2") to 29 U.S.C. § 1054(g) as follows:

> (2) For purposes of paragraph (1), a plan amendment which has the effect of—
>
> (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or (B) eliminating an optional form of benefit, *with respect to benefits attributable to service* before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy. The Secretary of the Treasury may by regulations provide that this subparagraph shall not apply to a plan amendment described in subparagraph (B) (other than a

plan amendment having an effect described in subparagraph (A)). (Emphasis added).[2]

The statutory definition of "accrued benefit" is essential in order to understand what benefits are protected. For purposes of the entire ERISA statute, the term "accrued benefits" is defined at 29 U.S.C. § 1002(23):

(23). The term "accrued benefit" means—(A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3), of this title, expressed in the form of an annual benefit commencing at *normal retirement age,* or (B) in the case of a plan which is an individual account plan, the balance of the individual's account.

The accrued benefit of an employee shall not be less than the amount determined under section 1054(c)(2)(B) of this title with respect to the employee's accumulated contribution.

(Emphasis added). Thus, for a benefit to be accrued, it must be expressed in the form of an annual benefit commencing at normal retirement age. "Normal retirement age" is defined as "normal retirement age under the plan...." 29 U.S.C. § 1002(24). Because early retirement benefits,[3] including social security supplements, do not commence at normal retirement age, they are not "accrued benefits" and, therefore, are not protected against termination or diminution under paragraph (1). 26 C.F.R. § 1.411(a)–7(c)(4) (social security supplements are not included in the definition of accrued benefits). *See Ashenbaugh v. Crucible Inc. 1975 Salaried Retirement Plan,* 854 F.2d 1516, 1525 (3d Cir.1988) (thirty year pension benefits provided by employer were not within the statutory definition of "accrued benefit"), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989); *American Stores Co.*

*v. American Stores Co. Retirement Plan,* 928 F.2d 986 (10th Cir.1991) (early retirement benefits which exceeded normal retirement age benefits were not "accrued benefits"); *Sutton v. Wierton Steel Div. of Nat'l Steel Corp.,* 724 F.2d 406, 410 (4th Cir.1983) (contingent early retirement benefits are not "accrued benefits"), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

However, plaintiffs argue that Congress amended 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6) by adding paragraph (2) to each subsection, and that it did so for the purpose of protecting early retirement benefits, including social security supplements. Plaintiffs argue that paragraph (2) extends the meaning of accrued benefits in paragraph (1) and that it now includes early retirement benefits and social security supplements. Thus, they argue that the plan amendment which eliminated their early retirement benefit, *i.e.,* social security supplements, "[should] be treated as reducing accrued benefits" for the purposes of paragraph (1). 29 U.S.C. § 1054(g)(2). In other words, plaintiffs argue that 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6), as amended, protect their social security supplements.

Defendant GM argues that 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6), as amended, do not provide protection for the social security supplements. We agree. First, the plain language of 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6) states that a plan amendment which has the effect of eliminating or reducing an early retirement benefit will be treated as reducing accrued benefits only with respect to *"benefits attributable to service before the amendment."* 29 U.S.C. § 1054(g) (emphasis added).

In this case, social security supplements are not attributable to service which plaintiffs performed before GM amended the

---

**2.** The Internal Revenue Code counterpart, 26 U.S.C. § 411(d)(6), is virtually identical to 29 U.S.C. § 1054(g).

**3.** Early retirement benefits are not defined by the statute. However, "[e]arly retirement benefits are generally benefits that become available

upon retirement at or after a specified age which is below the normal retirement age, and/or upon completion of a specified period of service." *Ross v. Pension Plan for Hourly Employees of SKF Indus.,* 847 F.2d 329, 333 (6th Cir.1988).

retirement plan because the plan stated that in order to receive the social security supplements, the employee must have obtained thirty years of credited service. Plaintiffs did not meet the prerequisites of the plan before the amendment. Therefore, even assuming arguendo that paragraph (2) creates some special definition of "accrued benefits," that definition does not extend to benefits which are not attributable to service before the plan was amended.

Our conclusion is supported by the Third Circuit's decision in *Berger v. Edgewater Steel Co.*, 911 F.2d 911 (3d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991), which held that a supplement for early retirees was not protected by 29 U.S.C. § 1054(g), as amended, because the employees had not met the prerequisites to obtain the supplement before the plan was amended. In that case employees who retired under an early retirement plan, called the 70/80 plan, would receive a special payment, the regular pension, and an extra $330 per month if the employee's retirement was in the mutual interest of the employee and the company and was approved by the company under mutually satisfactory conditions. *Berger*, 911 F.2d at 914. Because the company could not afford the $330 per month for its retiring employees, the company instituted a blanket policy denying all requests for the supplemental $330, essentially amending its plan. The Third Circuit, in exam-

ining the amended statute, held that "[b]ecause early retirement benefits do not commence at normal retirement age, they are not accrued benefits." *Id.* at 918. The court further held that because the plaintiffs had not met the conditions of the plan, the $330 supplement was not an accrued benefit and was not protected under 29 U.S.C. § 1054(g), as amended.

Likewise, in this case, the social security supplements are not an accrued benefit because plaintiffs did not meet the prerequisites under the plan for receiving the supplements before the amendment of the plan. Paragraph (2) offers plaintiffs no relief from the plan amendment because they did not meet the conditions necessary to entitle them to the social security supplements before GM amended the plan.[4]

Finally, our conclusion is also supported by the Secretary of the Treasury's regulation, 26 C.F.R. § 1.411(d)–4–A–1(d), effective January 30, 1986. The regulation does not clarify the way in which paragraph (2) affects the definition of "accrued benefits" for the purpose of paragraph (1). Instead, the regulation specifically states that social security supplements are not "protected benefits" under 26 U.S.C. § 411(d)(6). Therefore, plaintiffs' argument that these benefits are protected under 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6) is rejected.[5]

---

**4.** Plaintiffs argue that the Second Circuit's decision in *Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402 (2d Cir.1985), *cert. denied*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986), supports the conclusion that early retirement benefits are protected under 29 U.S.C. § 1054(g) or 26 U.S.C. § 411(d)(6). *Amato*, however, involved "early retirement benefits that [were] not contingent on an external event" like the achievement of thirty years of service. *Amato*, 773 F.2d at 1413. In this case, we are only concerned with social security supplements which were contingent upon the attainment of thirty years of employment with GM. Furthermore, *Amato* supports the position that social security supplements are not accrued benefits. The court stated: "Social security supplements which cease upon the employee's reaching normal retirement age ... differ entirely from unreduced retirement benefits to which an employee might become entitled under a retirement plan." *Id.* at 1410.

**5.** The IRS Closing Agreement states:

[S]ection 411(d)(6) of the Internal Revenue Code does not prohibit the cessation of future benefit accruals after a plan amendment; however, such section does protect the entitlement, including the right to satisfy after the amendment pre-amendment eligibility conditions, with respect to benefits accrued prior to the amendment, including early retirement subsidies (*but excluding social security supplements*) . . . .

Closing Agreement at 2 (emphasis added). This Closing Agreement is a product of the determination letter process. Determination letters "may not be used or cited as precedent." 26 U.S.C. § 6110(j)(3). However, determination letters may be given "some weight" in the construction of the Internal Revenue Code. *Amato*, 773 F.2d at 1412–13.

**C. Contractual Rights to Participate in the Early Retirement Program and to Receive Social Security Supplements**

Plaintiffs argue that the GM retirement program created enforceable contractual rights[6] to the thirty-and-out retirement benefits, including the social security supplements, and that, consequently, the district court erred in relying on a clause in the GM retirement plan that reserved to GM the right "to amend, modify, suspend or terminate the program in the future." The district court held that, under the terms of its plan, defendant GM had lawfully reserved the right to amend the plan under section 8A of the retirement plan. Therefore, plaintiffs' contractual rights to participate in the thirty-and-out program with its social security supplements would arise only if and when plaintiffs complied with the terms of the plan as they existed before the plan was amended. Under the plan, plaintiffs had to complete thirty years of credited service with GM before they were entitled to participate in the thirty-and-out program or to receive the social security supplements. Because they did not complete thirty years of service, the district court held that plaintiffs were not entitled to the thirty-and-out program and the social security supplements.

Plaintiffs fail to articulate any violation of the retirement plan by GM or any reason why the "right to amend" clause, section 8A, was illegal. They argue, however, that the clause allowed a forfeiture of their rights and that, therefore, the district court should have disregarded it. Plaintiffs rely on *Amato v. Western Union International, Inc.,* 773 F.2d 1402, 1418 (2d Cir.1985), *cert. dismissed,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986), for the proposition that a court cannot rely "upon a simple reservation of rights clause in a pension plan."[7] Plaintiffs' Brief at 17.

In *Amato,* the Second Circuit held that the district court erred in focusing "solely" on a "right to terminate or amend" clause in the retirement plan. The district court apparently believed that the existence of such a clause in a retirement plan meant that no breach of contract claim could ever be predicated on the plan. The Second Circuit reversed, holding that the *mere existence* of a "right to terminate or amend" clause is not automatically fatal to a plaintiff's claim for breach of contract, and instructed the district court to consider plaintiffs' breach of contract contentions on remand. *Id.*

In the present case, the district court did not slight plaintiffs' contractual claims by finding that the mere existence of a "right to terminate or amend" clause made an analysis of the claims unnecessary. Rather, it fully considered plaintiffs' claim of a contractual entitlement to early retirement and social security supplements but found that GM amended its plan according to its reservation of its right to do so. That amendment, as applied to plaintiffs, resulted only in the deprivation of plaintiffs' hopes, not their contract rights. Thus, *Amato* represents an entirely different situation and furnishes no support for plaintiffs' contract claims.

We further hold that *Amato* does not support plaintiffs' argument that the district court erred in relying on the reservation of the right to amend clause because the clause created an impermissible forfeiture of their rights. In *In re White Farm Equipment Co.,* 788 F.2d 1186, 1187 (6th Cir.1986), plaintiffs' retiree welfare benefits were terminated pursuant to a reserved right to terminate. Plaintiffs were

---

6. Common law contract claims are pre-empted by ERISA, 29 U.S.C. § 1144. If a retirement plan creates rights in excess of those established by ERISA, however, those rights may be enforceable in contract under federal common law. *See Adam v. Avondale Indus., Inc.,* 905 F.2d 943, 949 (6th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990).

7. Plaintiffs also rely on the pre–ERISA case of *In re Erie Lackawanna Railway Co.,* 548 F.2d

621 (6th Cir.1977). Because *Lackawanna* has been rejected by this court in post-ERISA cases dealing with benefit plans where companies reserved the right to terminate, modify or amend benefits, "we are not bound to follow the Ohio law construed there." *In re White Farm Equipment Co.,* 788 F.2d 1186, 1192 (6th Cir.1986); *see Musso v. American General Corp.,* 861 F.2d 897, 907 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989).

retirees or beneficiaries by the time these benefits were terminated. This court found that the matter was one exclusively of federal concern and determined that the termination of welfare benefits did not violate ERISA. Rejecting the district court's holding that "an employer may *not* invoke an unambiguous termination clause to cut off the welfare benefits of a properly retired employee," this court remanded the case for a determination of whether, in fact, the termination clause was unambiguous. *Id.* at 1193 (emphasis added). Because there is an unambiguous termination or amendment clause in this case, we agree with the district court that the clause must be given effect. *See Musso,* 861 F.2d at 907. Thus, we conclude that the district court did not err in relying on GM's reservation of the right to amend.

The Eleventh Circuit's decision in *Chesser v. Babcock & Wilcox,* 753 F.2d 1570 (11th Cir.), *cert. denied,* 474 U.S. 836, 106 S.Ct. 112, 88 L.Ed.2d 91 (1985), also supports our conclusion. In *Chesser* employees were laid off after twenty-five years of service with their employer. Had they been able to obtain thirty years of service, they would have been entitled to early retirement benefits. The court found that the plan did not violate ERISA merely because plaintiffs were denied early retirement benefits. In that case, as in this case, the plaintiffs were not denied the retirement benefits that would be available to them when they reached normal retirement age. The court stated:

> But when a plan exceeds the minimum requirements of ERISA, the employer is acting *ex gratia* with respect to such excess coverage, and is liable only for such benefits as are voluntarily agreed to by the employer and are specified in the terms of the plan, and the employee must comply with the terms of the plan in order to be entitled to such benefits.

*Id.* at 1573.

Plaintiffs have supplemented their argument with a recent decision by this court,

*Armistead v. Vernitron Corp.,* 944 F.2d 1287 (6th Cir.1991), a case which plaintiffs insist is "highly relevant" to the resolution of this case. *Armistead* involved a plant closing. Defendant denied its employees, who retired on the day the plant closed, lifetime medical and life insurance benefits which the employees had anticipated receiving upon retirement. To justify its actions, the defendant relied on a right to terminate clause in a booklet addressing employees' benefits. This court found, however, that the booklet had been superceded by a more recent edition in which the termination clause was omitted. Moreover, the collective bargaining agreement relevant at the time the plaintiffs retired did not contain any language reserving the defendant's right to terminate.

Under those circumstances, this court found that the parties had not reserved the termination clause in their agreement, and it declined the defendant's invitation to read a termination clause into the agreement because "reading into the agreement a clause permitting Vernitron to terminate all benefits programs, not just retiree insurance benefits, would render illusory Vernitron's promise to provide these benefits." *Id.* at 1296. Thus, *Armistead* is distinguishable on its facts, and plaintiff's reliance on it is misplaced.

Thus, we conclude that defendant GM did not violate its retirement plan when it amended the plan in 1984 pursuant to a reserved right to amend. GM has complied with the terms of the plan, and plaintiffs have no contractual rights to receive social security supplements upon early retirement from EDS.[8]

### D. The IRS Closing Agreement

The next issue raised by plaintiffs is whether the district court erred in holding that the IRS Closing Agreement and Technical Advice Memorandum of July 18, 1988,[9] had no impact on the court's decision dated August 8, 1986. Plaintiffs do not

---

**8.** Plaintiffs also argue that because GM sought to obtain a release of their rights to early retirement, they have conceded that plaintiffs have a right to the early retirement benefits. Plaintiffs

cite no authority to support their theory, and we find that this argument is without merit.

**9.** *See supra* n. 5.

explain how the Closing Agreement affected the challenged decision of the district court. They state only that the closing agreement "raised far more questions than it answered and did not at all dispose of the issues involved in this case." Plaintiffs' Brief Supplemental at 10. Plaintiffs ask us to "recognize the questions raised by the IRS Closing Agreement" and remand the case in order that IRS examiners can testify, Plaintiffs' Brief Supplemental at 30, but they do not state what "questions" are raised by the closing agreement or what "issues" it does not "dispose of." Plaintiffs have failed to articulate any grounds on which we could find that the district court erred and have failed to make any sensible argument on this issue. What vague contentions that have been made are meritless.

### E. Attorney's Fees

■ Plaintiffs filed two fee petitions with the district court, the first on November 14, 1986, and the second, a supplemental fee petition, on August 15, 1989. Each claimed the right to attorney's fees and costs under 29 U.S.C. § 1132(g), which provides in relevant part:

> Attorney's fees and costs; awards in actions involving delinquent contributions. (1) In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

The district court overruled plaintiffs' motions for attorney fees on November 27, 1989.

The decision to grant attorney's fees is committed to the discretion of the district court, and its decision will not be disturbed absent a clear showing of abuse of discretion. *E.g., Sweet v. Consolidated Aluminum Corp.,* 913 F.2d 268, 271 (6th Cir. 1990); *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir.1987). Plaintiffs were not the prevailing party on the ERISA claim, and, therefore, it was not an abuse of discretion to deny plaintiffs' motions for attorney's fees. *Bittner v. Sadoff & Rudoy Indus.,* 728 F.2d 820, 829 (7th Cir.1987) ("it would be an abuse of discretion for the district court to award attorney's fees to a losing party, even though section 1132(g)(1) does not in so many words confine awards of attorney's fees to winners...."); *Lawrence v. Westerhaus,* 749 F.2d 494, 496 (8th Cir. 1984) ("a court may properly deny a claim for attorneys' fees solely on the ground that the plaintiff obtained no relief under the statute.").

Plaintiffs argue that because they were successful on the Stock Incentive Plan issue, the district court has abused its discretion in denying their motion for attorney fees. They contend that the Stock Incentive Plan issue and the ERISA issue are somehow "inextricably bound together." Although Congress has authorized the district courts to award attorney's fees to prevailing litigants of ERISA claims under 29 U.S.C. § 1132(g), no similar authorization has been given by Congress for claims which are merely factually related to an ERISA claim and over which the court has pendent jurisdiction. The "American Rule" requires that each party to a lawsuit "ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). Because there is no statutory authorization to award attorney's fees to successful litigants of pendent state claims,[10] we conclude that the district court did not abuse its discretion when it denied plaintiffs' motion for attorney's fees.

### F. Stock Incentive Plan

The final issue for our determination concerns whether or not plaintiffs are entitled to participate in defendants' Stock Incentive Plan. The district court held that the plaintiffs are so entitled on equitable

---

**10.** Michigan law would not allow an award of attorney's fees if the Stock Incentive Plan issue had been tried in a Michigan court. *See State Farm Mut. Auto Ins. Co. v. Allen,* 50 Mich.App. 71, 212 N.W.2d 821, 823 (1973); *Walch v. Crandall,* 164 Mich.App. 181, 416 N.W.2d 375, 381 (1987).

grounds. However, defendants in their cross-appeal offer a number of arguments in support of their contention that the district court erred in its holding, a primary argument being that an equitable claim for participation in the Stock Incentive Plan was never presented or argued in the district court. While plaintiffs dispute defendants' arguments, plaintiffs also argue, in the alternative, that they possess a contractual entitlement to participate in the Stock Incentive Plan.

■ Defendants first argue that plaintiffs have waived their right to appeal the district court's October 31, 1985, order granting partial summary judgment against plaintiffs on their state claim of a contractual entitlement to participate in the Stock Incentive Plan. Defendants' argument is based on the fact that plaintiffs have never specifically mentioned the October 31, 1985, order in their two notices of appeal to this court. Defendants argue that Federal Rule of Appellate Procedure 3(c) requires that the notice of appeal identify with specificity *each* order or judgment which is appealed.

However, it is well settled in this circuit that an appeal from a final judgment draws into question all prior non-final rulings and orders. *McLaurin v. Fischer*, 768 F.2d 98, 101 (6th Cir.1985); *see also Taylor v. United States*, 848 F.2d 715 (6th Cir.1988). It is also well settled that an order granting partial summary judgment is not a final, appealable order.[11] *See* Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2715 (2d ed. 1983).

In their first notice of appeal to this court on November 14, 1986, plaintiffs appealed the district court's final judgment entered on October 22, 1986. Therefore, plaintiffs' first notice of appeal draws into question the prior partial summary judgment entered against plaintiffs regarding a contractual entitlement to the Stock Incentive Plan. Defendants' reliance upon *Wil-*

son v. Firestone Tire & Rubber Co., 932 F.2d 510 (6th Cir.1991), is misplaced as that case is clearly distinguishable from the present case. In *Wilson,* unlike this case, the appellant chose to designate specific rulings by the district court "in his notice of appeal—rather than simply appealing from the entire judgment...." *Id.* at 516.

Plaintiffs' second notice of appeal filed December 27, 1989, states that plaintiffs appeal the district court's

> Opinion and Order denying plaintiff's Motion for Fees and Costs entered ... on November 27, 1989 and also the Order Holding That The IRS Closing Agreement And Technical Advice Do Not Affect This Court's Prior Decision of August 8, 1986 entered on December 11, 1989.

In its judgment of December 11, 1989, the district court reaffirms its judgment of October 22, 1986, in its entirety. Therefore, plaintiffs have preserved for appeal the district court's grant of partial summary judgment in favor of defendants on their claims of contractual right to the Stock Incentive Plan.

■ There is no dispute as to the facts concerning the Stock Incentive Plan issue. However, the parties dispute the interpretation of the facts. Between November 1 and 5, 1984, GM employees were given packets of information indicating that a grant of stock "will be given" to employees with at least one year of service upon their transferring to EDS. The information indicated that defendants "expect this will become available in February, 1985."

On November 12, 1984, plaintiff Omans received the following letter:

> I want to welcome you to the new EDS!
>
> This letter gives me the exciting opportunity to personally tell you that after you become an employee of the new EDS, *EDS and GM* intend to offer a "Special Recognition" grant under a new Stock Incentive Plan (SIP). The SIP will

---

**11.** For some exceptions to this general rule, see Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2715 (2d ed. 1983). *See also Mitchell v. Forsythe*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *Kennedy v. City of Cleveland*, 797 F.2d 297, 299–300 (6th Cir.1986), *cert. denied*, 479 U.S. 1103, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987).

enable grants to be issued covering General Motors Corporation's new Class E Common Stock, a class of GM equity securities, the market performance of which is intended to be related to the future business performance of the new EDS. We hope and believe that you will be a vital part of that performance.

(Emphasis added).

Under this proposed grant, you will have the opportunity to purchase 930 shares of Class E Common Stock at a nominal price of 10 cents per share. This grant will occur as soon as a definitive Prospectus is available. We expect this to be accomplished before year-end. A Prospectus is the only means by which an offer can be made relating to participation in the SIP.

You will obtain an equity position in the future of the new EDS—with the right to receive income based upon the earnings of the new EDS commensurate with dividends paid on Class E Common Stock when and as declared. Your income from the SIP grant would be started with the first quarterly dividend on Class E Common Stock which is declared after the grants are issued.

I want you to remember that this initial grant is based *primarily* in consideration of your prior service and experience with GM. This experience at GM formed the basis of GM data processing operations which will be built upon by the new EDS *with your help. You will be eligible to receive additional grants during future years based on your individual performance and contribution to the success of the new EDS!*

(Emphasis in original).

This letter was signed by Mort Meyerson, President of EDS, and Ken Riedlinger, Senior Vice President of EDS. Plaintiff

Cattin received the same letter except the amount of shares specified in his letter was 870 shares.

In February 1985, *after plaintiffs transferred to EDS,* defendants made the offer of stock available but included a previously undisclosed release clause requiring plaintiffs to relinquish all claims against defendants relating to the transfer.[12] From our review of the language contained in defendants' letters to plaintiffs and in the information packet, it is clear that the defendants' intentions were to offer the plaintiffs an "exciting opportunity" to purchase a specific amount of Class E common stock at a "nominal price of ten cents per share" upon plaintiffs' transfer to EDS. As the district court held in its August 8, 1986, opinion, "[d]efendants clearly promised the data processing employees of GM that when they transferred to EDS, a stock grant would be available to them in recognition of past service and to induce them to transfer." The court further held that there was no indication that plaintiffs would be required to relinquish major rights in order to participate in the Stock Incentive Plan as EDS employees.

Nevertheless, as defendants correctly observe, defendants did state in their November 12, 1984, letters, "[a] Prospectus is the only means by which an offer can be made relating to participation in the SIP." However, in light of the remaining portions of the letters, which express an unequivocal intention to make the stock opportunity available, defendants' reference to a prospectus appears only to be a statement to the employees that certain technical formalities must be complied with before the opportunity to purchase the stock would be available to them. Thus, we conclude that defendants made an offer to plaintiffs to

12. Paragraph 6 of the Stock Agreement provided as follows:

*"Buyer's Release".* In consideration of the grant and sale of shares of Class E Stock pursuant to this Agreement, Buyer hereby releases and forever discharges GM and the Company, their officers, directors and employees from all claims, demands and causes of action, known or unknown, which Buyer may have based upon or relating to his trans-

fer under any state or federal law or regulation relating to employment and any claims for breach of employment contract, either express or implied. Buyer further agrees not to institute any proceeding, suit, action at law or in equity against GM, the Company or their officers, directors, agents, employees, or stockholders, based on any of the matters covered by the release set forth above.

have the opportunity to purchase stock after they transferred to EDS from GM. In other words, the defendants made a contract to make a contract for the sale of stock. In Michigan, a contract to make a contract is enforceable when the essential terms are definite. *Opdyke Inv. Co. v. Norris Grain Co.*, 413 Mich. 354, 320 N.W.2d 836, 838 (1982). In this case, the amount and price of the stock which could be purchased was specified in the November 12, 1984, letters. These, we believe, are the essential terms of the contract in this case.

■ Plaintiffs accepted defendants' written offer on January 1, 1986, when they transferred to EDS. As a result, a unilateral contract was formed with performance due by defendants. In order to perform, defendants had to make available to plaintiffs the opportunity to purchase the amounts of stock at the price specified in defendants' letters to plaintiffs dated November 12, 1984. *See* 1 Arthur L. Corbin, *Corbin on Contracts* § 70 (1963) (A unilateral contract is formed where one party performs an act in exchange for a promise.). When defendants inserted the release clause into the stock agreement after plaintiffs transferred, they attempted to require plaintiffs to pay additional consideration when none was due.

■ Defendants argue that if there was a contract made regarding the sale of stock to plaintiffs, the contract does not comply with the applicable Michigan Statute of Frauds and thus is unenforceable.[13] It was on this basis that the district court in this case granted summary judgment to defendants on this issue. The district court determined that the November 12, 1984, letters failed to establish executory contracts for the sale of stock and, therefore, could not be enforced under the statute of frauds.

We disagree. The Michigan Supreme Court in *Opdyke Investment Co. v. Norris Grain Co.*, 320 N.W.2d at 841 (Mich.1982), declined to adopt narrow and rigid rules for compliance with the statute of frauds. Instead, the Michigan Supreme Court held that in order to satisfy Mich.Comp.Laws Ann. § 440.8319 (1967), *see id.* 320 N.W.2d at 840, n. 2,

> [s]ome note or memorandum having substantial probative value in establishing the contract must exist; but its sufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found.... That is the rule of law to be applied with intelligence and discrimination and not like a pedant playing a game of logomachy.

*Id.* 320 N.W.2d at 841–42; *see also Jim-Bob, Inc. v. Mehling*, 178 Mich.App. 71, 443 N.W.2d 451, 457 (1989), *appeal denied*, 434 Mich. 865 (1990).

In *Opdyke*, the Michigan Supreme Court held that a letter, signed by the defendant and expressing an intent to build a sports arena, did satisfy the applicable statute of frauds even though a factual issue remained regarding whether the plaintiff had accepted the offer made in the letter to build the sports arena. The court focused on the substantial probative value of the letter in establishing the terms of a contract and the intent of the parties, not whether a contract had been accepted at the time the letter was written. *See Opdyke*, 320 N.W.2d at 842. Moreover, the court noted that "an offer may be accepted in any manner reasonable under the circumstances, unless the offeror specifies an exclusive mode of acceptance." *Id.* 320 N.W.2d at 839. Thus, the questions of whether the writing satisfies the applicable statute of frauds and whether a valid offer has been accepted are two distinct issues.

---

**13.** The Michigan Statute of Frauds, Mich.Comp. Laws Ann. § 440.8319 (1967), provides in relevant part:

A contract for the sale of securities is not enforceable by way of action or defense unless:

(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

(b) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment....

In this case the mode of acceptance was the act of transferring. The fact that the act of acceptance was performed after the letters were written does not impair the letters' substantial probative value in determining the establishment of a contract for the purposes of the statute of frauds. In this connection, the letters, which were written in behalf of both GM and EDS, set forth the essential terms of the agreement as required by Mich.Comp.Laws § 440.-8319, *viz.*, the amount and price of the stock which the respective plaintiffs could purchase from defendants. Therefore, we hold that the November 12, 1984, letters to plaintiffs comply with the Michigan Statute of Frauds, Mich.Comp.Laws Ann. § 440.-8319(a) (1967).

■ It is also plausible to say that plaintiffs satisfied the requirements of partial performance under Mich.Comp.Laws Ann. § 440.8319(b) (1967) thereby making the contract enforceable. Mich.Comp.Laws Ann. § 440.8319(b) (1967) provides that a contract for the sale of securities is enforceable if payment has been made but only to the extent of the payment. *See, e.g., Ter Keurst v. First State Bank*, 271 Mich. 259, 260 N.W. 158 (1935) (acceptance of bonds and payment for bonds constituted partial performance removing contract from statute of frauds). In this case, payment was made when plaintiffs transferred to EDS. As defendants themselves stated in EDS's November 12, 1984, letters to plaintiffs, the price of ten cents per share was "nominal." The primary consideration was plaintiffs' transfer from GM to EDS. Thus, defendants' agreement to give plaintiffs the opportunity to purchase stock up to the amounts specified in the November 12, 1984, letters is enforceable.[14]

■ Therefore, the district court erred in granting summary judgment for the defendants on the contract theory. The district court should have found either by summary judgment or after the trial that the contract theory supported the plaintiffs' claims for the reasons stated above. The same performance, however, cannot

serve to satisfy both the detrimental reliance requirement of promissory estoppel and the consideration for the written contract. *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038 (6th Cir.1990) (reh'g denied). Here, plaintiffs' transfer to EDS constituted acceptance of the unilateral contract as well as both the consideration for the contract and the detrimental reliance. Accordingly, the district court erred in basing its judgment for plaintiffs on equitable grounds. However, as the district court reached the right result, we are free to affirm on a different ground. *Ritchie v. Wickstrom*, 938 F.2d 689, 692 (6th Cir.1991).

### III.

For the reasons stated, we AFFIRM the district court's judgment that plaintiffs are not entitled to early retirement benefits but are entitled to participate in defendants' Stock Incentive Plan without executing the release clause. We also AFFIRM the district court's denial of plaintiffs' motions for attorney's fees.

---

**14.** Defendants' reliance on our unpublished opinion in *Miller v. General Motors Corp.*, 845 F.2d 326 (6th Cir.1988) is misplaced. *Miller*, as

unpublished and not a binding precedent, is clearly distinguishable from this case.