**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0517n.06
Filed: August 21, 2008

No. 07-1914

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **Marilyn Galenski,** | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | |
| **v.** | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| **Ford Motor Company Pension Plan,** | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |
| | ) | |

BEFORE:    **Merritt, Clay, and Gilman, Circuit Judges.**

**MERRITT, Circuit Judge.**  This case arises under the Employment Retirement Income Security Act of 1974 ("ERISA"), as amended by the Retirement Equity Act of 1984, 29 U.S.C. § 1056(d)(3). Defendant, Ford Motor Company, appeals from an award of summary judgment granted to plaintiff, Marilyn Galenski, the divorced wife of a former Ford employee, Joseph Galenski, who died at age 53, two years before he became eligible to receive any pension benefits under Ford's pension plan.  The district court mistakenly awarded plaintiff pension benefits based on what her deceased, ex-husband would have received had he lived and started receiving benefits at age 55 or 65, instead of the lesser pre-retirement, surviving spouse benefit provided by Ford's plan.  The key to this case was overlooked by the district court:  the Ford pension plan clearly provides that the

employee may not receive a pension unless he lives until he is eligible.[1]  Thus, Joseph Galenski's

entitlement to pension benefits never went into effect.  The plan then provides for a divorced spouse

as follows:

> The only benefit payable in such a case would be a surviving spouse benefit [not a pension benefit] and only if [a qualified domestic relations order issued by a court] provides for the [spouse] to be considered the participant's surviving spouse for the purposes of the pre-retirement survivor annuity.

Joint Appendix at 12.  Ford appeals, arguing correctly that it did not act arbitrarily and capriciously

when it decided that plaintiff was entitled only to a pre-retirement surviving spouse benefit instead

of the pension benefits her deceased ex-husband would have received had he lived to age 55 and

become eligible for a pension.  Ford is also correct in its argument that the district court erred in its

decision to award Marilyn Galenski attorney fees due to a finding of bad faith on the part of Ford.

We, therefore, reverse the judgment of the district court on both issues.  The plain language

of Ford's plan states that plaintiff is entitled only to a pre-retirement surviving spouse benefit and

not the pension benefit that she seeks.  On remand, the district court should direct Ford to allow

plaintiff to file an application for pre-retirement surviving spouse benefits, and, if she does so, to

award such benefits without penalty due to any delay caused by this litigation.

## I.

Marilyn and Joseph Galenski were married in 1969, the same year that Joseph began working

as an hourly employee for Ford Motor Company at its Livonia, Michigan, plant.  As a term of his

---

[1]The pension plan states that "if the employee or his designated spouse dies before the effective date of an election . . . the election automatically will be cancelled" (Joint Appendix at 303), and that an employee's monthly benefits "shall become payable to such employee, *if he shall be living* . . . ." (*Id.* at 312) (emphasis added).

employment, Joseph was entitled to certain pension benefits in the future under a program administered by Ford. The Galenskis had four children and divorced in 1983 after 14 years of marriage. Under the original divorce decree, Marilyn received custody of all four minor children and Joseph was to pay $45/week for each child until she or he reached age 18. Marilyn was not entitled to any future pension benefits received by Joseph under the original decree. Default Judgment of divorce by Withdrawal (Wayne Cty., Mich., Cir. Ct. Dec. 9, 1983) ("Joe Galenski . . . is awarded his pension plan, if any, through his employer free and clear of any rights, claims, and interests of . . . Marilyn Galenski."). Because Joseph failed to keep current with support payments, the decree was modified by court order in 1988 to provide that Joseph would pay $180/week in child support for the three remaining minor children and ordered that the amount would be garnished from his paycheck at Ford. The Order also provided that any income due to Joseph from any source, including pensions, shall be remitted to the court for purposes of paying the back child support due to Marilyn. Order Modifying Default Judgment of Divorce (Wayne Cty., Mich., Cir. Ct. Sept. 14, 1988).

In 1989, after almost 20 years of working at Ford, Joseph voluntarily terminated his employment. Once Joseph ceased working at Ford, he stopped making child support payments. By 1998 he owed Marilyn slightly more than $51,000 in back support payments. In January 1998, Marilyn, who had since moved to Indiana, requested that the State of Indiana file a lien against Joseph's interest in his pension benefits in the amount of $51,265.28. Marilyn contacted Ford in 1998 to make arrangements for her to receive Joseph's pension benefits directly when they became

payable.[2] Under the terms of ERISA and the Retirement Equity Act of 1984, Marilyn was required to file a "qualified domestic relations order" (sometimes referred to as a "QDRO") in order to receive Joseph's pension benefits.[3] Marilyn's attorney began negotiations with Ford in 1998 that spanned four years before the parties were able to file a Qualified Domestic Relations Order that satisfied the terms of Ford's plan and ERISA. *See* Letter from Ford to Joe and Marilyn Galenski, dated Feb. 10, 1998 (advising the Galenskis that "[i]f [a court] order requires payment to anyone other than Participant [*i.e.,* Joseph Galenski] a Qualified Domestic Relations Order (QDRO) will be required in accordance with the Plan."). Joseph was not part of this process and it appears from the record that his whereabouts were unknown during this time. A court-certified copy of the Order was forwarded to Ford on February 21, 2002.

Soon after the Amended Qualified Domestic Relations Order was approved and entered, the parties learned Joseph had died nine months earlier, on June 13, 2001. Joseph was 53 years of age

---

[2]As a result of his employment at Ford, the Ford pension plan entitled Joseph to begin receiving reduced pension benefits on March 14, 2003, his 55th birthday, or full pension benefits at age 65 (March 14, 2013).

[3]A Qualified Domestic Relations Order is a "domestic relations order . . . which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan" and which meets certain statutory requirements. 29 U.S.C. § 1056(d)(3)(B)(i). An "alternate payee" is "any spouse, former spouse, child, or other dependant of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K). Under ERISA, surviving spouse benefits vest in a participant's current spouse, or ex-spouse in cases where a valid Qualified Domestic Relations Order exists, on the date when participant retires. 29 U.S.C.A. § 1055(a), (c)(2)(A), (f).

at the time of his death. By letter sent to Marilyn by Ford, on March 26, 2002, Ford erroneously advised her that because the Qualified Domestic Relations Order had not been approved *prior* to Joseph's death, "the Alternate Payee [Marilyn] is not entitled to any benefits from the Plan. The benefit ceased to be payable at the time of the Participant's death." Letter from Ford to Marilyn Galenski, dated Mar. 26, 2002. On June 11, 2002, Ford acknowledged its earlier error denying benefits and sent Marilyn's attorney a letter indicating that Marilyn was entitled to surviving spouse benefits if a Nunc Pro Tunc Order was obtained for the Amended Qualified Domestic Relations Order from February 2002 back to the date of Joseph's death in June 2001. The letter also stated that section 5 of the Amended Qualified Domestic Relations Order must be changed to "give the Alternate Payee [Marilyn] all available pre-retirement surviving spouse benefits." The letter concludes by stating that "Please be advised that your client will not be able to receive her surviving spouse benefits until the date that the participant would have been eligible for early retirement. Since the Participant [Joseph] was a deferred vested, [Marilyn] may begin her benefit when the Participant would have reached age 55." Letter from Ford to Gregory Stampien, dated June 11, 2002. Six months later, on December 16, 2002, Marilyn's attorney faxed a letter to Ford saying that he received the June 11, 2002, letter and "there are several . . . items that I am not certain of what you are attempting to accomplish." He asked that Ford contact him.

A long break between communications passed. During this time, Ford turned over responsibility for administering the Plan to Fidelity Investments, which became the Plan Administrator. On August 7, 2003, Fidelity Investments sent a letter to Marilyn and her attorney stating that it was in receipt of the Second Amended Qualified Domestic Relations Order and that

the Order met the necessary requirements for a Qualified Domestic Relations Order under ERISA. 29 U.S.C. § 1056(d)(3). On November, 21, 2003, Ford sent a letter to Marilyn reiterating that Marilyn was entitled to a surviving spouse benefit, but that she must apply for such benefits by submitting certain documentation, such as copies of birth, death and marriage certificates, as well as the divorce decree. A year later, on September 13, 2004, Ford sent another letter to Marilyn advising that the necessary documentation had not yet been received and benefits could not commence until it was received. Phone records during the month of December 2003 and January 2004 demonstrate that Marilyn's attorney advised her not to fill out the surviving spouse forms. Marilyn never submitted an application for surviving spouse benefits nor did she exercise her right to administratively appeal the decision in Fidelity's August 7, 2003, letter awarding her pre-retirement surviving spouse benefits.

Instead, Marilyn filed this action against Ford in the Eastern District of Michigan in April 2005. Marilyn moved for summary judgment and Ford countermoved for affirmation of an ERISA administrative decision. The district court granted Marilyn's motion and denied Ford's. *Galenski v. Ford Motor Co. Pension Plan*, 421 F. Supp. 2d 1015 (E.D. Mich. 2006). The district court's ruling found that Ford denied benefits to Marilyn based on the fact that a Qualified Domestic Relations Order had not been filed before Joseph's death. This was not the basis for Ford's denial of benefits. Ford's denial of pension benefits to Marilyn was based on the terms of Ford's pension plan, which states that a participant's eligibility to receive pension benefits terminates upon death. But, a surviving spouse may receive pre- or post-retirement surviving spouse benefits, which are set

at a lower level than full pension benefits, commencing on the date when the participant would have been eligible to begin receiving pension benefits.

The district court also found that Marilyn was entitled to "*post*-retirement surviving spouse benefits." This is also in error because Joseph never reached retirement age or eligibility to receive retirement benefits. The district court opinion gives no analysis as to how it reached this decision. Ford does not dispute that Marilyn is entitled to *pre*-retirement surviving spouse benefits and appealed the district court's decision.

## II.

We review *de novo* a district court's disposition of an ERISA action based on the administrative record and we apply the same legal standard as the district court. Where, as here, there is no dispute that the benefit plan gives the administrator discretionary authority to determine eligibility for benefits, an arbitrary and capricious standard of review is applied to the administrator's decision. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

### A. Plain Language of the Plan

The primary issue on appeal is the amount of the monthly payment to which Marilyn Galenski is entitled under the terms of Ford's plan. The district court, however, did not cite the language from the plan's Guidelines for Qualified Domestic Relations Orders or ERISA, both of which have very specific terms about eligibility for benefits. Instead, looking to the Indiana lien from 1998, the initial Qualified Domestic Relations Order from October 11, 2001, and the Amended Qualified Domestic Relations Order from February 12, 2002, the district court found that it was

"unable to ascertain any language which would support" a finding that Marilyn is entitled to only pre-retirement surviving spouse benefits.

Based on the plain language of the Qualified Domestic Relations Order Guidelines in Ford's plan, Marilyn should receive only the pre-retirement surviving spouse benefits because Joseph died before he was eligible to receive any retirement benefits. The relevant section in Ford's "QDRO Approval Guidelines and Procedures" under "Pre-Retirement Surviving Spouse" states:

> The Order may provide for the Alternate Payee to be treated as the Participant's surviving spouse under the Plan in the event of the death of the Participant before the Participant commences retirement benefits.
>
> *If the participant dies prior to his or her earliest eligible retirement date under the Plan, the Alternate Payee will not be entitled to receive the portion of the benefit awarded under the QDRO* (including a separate annuity based on the Alternate Payee's own lifetime). The *only* benefit payable in such case would be a surviving spouse benefit and only if the QDRO provides for the Alternate Payee to be considered the Participant's surviving spouse for the purposes of the pre-retirement survivor annuity. . . .

QDRO Guidelines at 5 (emphasis added). The plain language of the Guidelines, therefore, establishes that Marilyn is only entitled to the pre-retirement surviving spouse benefits, *regardless* of what the Qualified Domestic Relations Order says.

### B. Timing of Filing the Amended Qualified Domestic Relations Order

The district court found, erroneously, that Ford denied Marilyn benefits because the Amended Qualified Domestic Relations Order was not filed prior to Joseph's death in June 2001. As explained above, the record instead demonstrates that Ford denied pension benefits to Marilyn based on the language in the Plan and the fact that Joseph had not reached age 55, leaving Marilyn entitled only to pre-retirement surviving spouse benefits, the same benefits that she would have

received had she and Joseph remained married until his death. Although the district court found that it would be "futile" for Marilyn to file for surviving spouse benefits, there is nothing in the record that supports such a finding. To the contrary, Ford has encouraged Marilyn to apply for such benefits numerous times and sent her the required forms.

### C. Whether Marilyn's Interest in Joseph's Pension Is a "Separate Interest"

Marilyn also incorrectly argues that the Indiana lien gave her a "separate interest" in Joseph's pension in the amount of $51,265.28 that she is entitled to collect from his "accrued pension benefit." Ford argues correctly that Marilyn's interest is "intertwined" with Joseph's and she cannot receive anything greater than Joseph would have received (or Joseph's spouse had he been married at the time of his death). Marilyn mistakenly relies upon a Third Circuit case that held that the ex-wife of a deceased pension plan participant had pre-existing rights to plan benefits where the domestic order stated that the "wife shall be entitled to one-half of the Exxon pension . . ." *Files v. Exxon Mobile Pension Plan*, 428 F.2d 478, 480 (3d Cir. 2005). The court held that that language created a separate interest in the pension for the ex-wife. But, unlike the instant case, the participant's pension had fully vested, and he was past the eligibility age of fifty prior to his death. Unlike in *Files*, Marilyn seeks to collect pension benefits to which Joseph never had a vested right. She has not cited a case, and we have not found one, where the surviving ex-spouse is entitled to more than the participant would have received had he lived or more than the participant's current spouse would receive if one existed at the time of the participant's death.

### D. Attorney Fees

Attorney fees are not appropriate in this case. We are reversing and remanding the case to the district court because we find that Ford did not act arbitrarily and capriciously in awarding only surviving spouse benefits to Marilyn. We, therefore, also reverse the award of attorney fees. *See, e.g., Cattin v. General Motors Corp.,* 955 F.2d 416, 427 (6th Cir. 1992) (it is always " 'an abuse of discretion for the district court to award attorney's fees to a losing party.' ") (quoting *Bittner v. Sadoff & Rudoy Indus.,* 728 F.2d 820, 829 (7th Cir. 1984)). As explained above, Ford's decision to deny pension benefits and award only surviving spouse benefits was reasonable based on the language in the Plan. Furthermore, we find nothing in the record to show that Ford acted in bad faith towards Marilyn.

### Conclusion

Based on the foregoing, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion. Instead of ordering the payment of Joseph Galenski's pension benefits, the district court should direct Ford to pay Marilyn pre-retirement surviving spouse benefits (and any back payments to March 14, 2003) after she has complied with the formality of filing a proper application.