Paul ADAMS, Jerry Baggett, Ron Baskerville, Robert Coch, Ron Curl, Michael Empel, William Frederick, G.P. Gagon, Gus Kefalos, Richard Gish, Calvin Jackson, Kenneth Johnson, Leonardo Martinez, Jerry Michael Moss, Michael Mykeloff, Michael O'Neill, Robert Saroli, Joanne Sleath, James D. Sprague, Wayne Thomas, and Johnie C. Taylor, Jr., individually and on behalf of a class, Plaintiffs,

v.

FORD MOTOR COMPANY, a foreign corporation, and Rouge Steel Company, a Michigan corporation, jointly and severally, Defendants.

No. 92–CV–71403DT.

United States District Court, E.D. Michigan, S.D.

March 31, 1994.

Robert H. Golden, Lathrup Village, MI, for plaintiffs.

Arnold G. Shulman, Dearborn, MI, for defendants.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This case involves various employment contract and employee benefit claims brought by a class of past and present salaried employees of Defendant Rouge Steel Company. The claims arise from Defendant Ford Motor Company's ("Ford") sale of a majority of stock in its then wholly-owned subsidiary, Defendant Rouge Steel Company ("Rouge Steel"), to Marico Acquisition Corporation ("MAC") on December 15, 1989.

### II. PROCEDURAL HISTORY

In their Second Amended Complaint, filed on April 30, 1993, Plaintiffs allege that they represent "a class of persons, such persons being all of the salaried employees of [Rouge Steel immediately] prior to its sale to [MAC]." Count I alleges that Ford and Rouge Steel breached an implied contract with Plaintiffs to make a good faith effort to find other positions for them at Ford when Plaintiffs were allegedly terminated by Ford as a result of the sale of Rouge Steel to MAC. Count II alleges that the sale of Rouge Steel to MAC in 1989 illegally denied Plaintiffs the opportunity to make up wage concessions granted prior to the sale. Count III alleges that Defendants made misrepresentations upon which Plaintiffs relied regarding the effect of the sale of Rouge Steel to MAC on their wages and benefits. Count IV alleges that Ford violated ERISA, and the terms of Ford's own pension plan, by instituting a formula for determining which Rouge Steel employees would receive a Ford pension and which employees would receive a Rouge Steel pension. Finally, Count V alleg-

es that Plaintiffs are entitled to benefits under Ford's Salaried Income Security Plan (SISP) because they were allegedly terminated from Ford employment when the sale of Rouge Steel to MAC took place.

This Court certified Plaintiffs' class on April 7, 1993. Discovery concluded on June 30, 1993. Defendants filed motions to dismiss all of Plaintiffs' counts on July 29 and September 21.[1] Plaintiffs responded on August 12 and October 8. Defendants replied on October 14 and filed a correction of their September 21 Motion and Brief on November 18. Having reviewed the parties' briefs, and after hearing extensive oral argument from counsel on December 21, 1993, the Court is now ready to rule on Defendants' motion. This Memorandum Opinion and Order sets forth that ruling.

### III. FACTUAL BACKGROUND

#### A. GENERAL BACKGROUND.

Prior to 1982, Rouge Steel was a division of Ford known as the "Steel Division." On January 1, 1982, Rouge Steel became a separate corporation wholly owned by Ford. All Steel Division employees were removed from Ford's employment rolls and were placed on the separate employment rolls of Rouge Steel. Although the employees filled out new employment applications as part of this change, they still retained or enjoyed Ford benefits, Ford identification cards, Ford profit sharing, and Ford lease plans. The parties also have stipulated to the following with regard to the 1982 creation of Rouge Steel as a wholly-owned subsidiary:

> Upon transferring to Rouge Steel Company [in 1982], th[e] Plaintiffs and class members signed statements acknowledging that the terms and conditions of their employment with Rouge Steel Company would remain the same as they had been at Ford, except that wages and benefits might vary.

Joint Final Pre-trial Order ¶ 4B.

In 1989, Ford entered into negotiations with MAC for the sale of 80% of the stock of

---

**1.** The Court will hereinafter refer to Defendants' motions for summary judgment as a single mo-

tion.

Rouge Steel. MAC then merged with Rouge Steel to form Marico–Rouge Steel (hereinafter "Rouge Steel"). The sale was eventually consummated on December 15, 1989.

In an effort to keep the Rouge Steel workforce intact, Defendants offered each Plaintiff as much as $6,000 in incentive pay if they would stay at Rouge Steel. Joint Final–Pretrial Order ¶ 4M. At the hearing on Defendants' motion, it was established that at least all deposed class members had accepted this payment. Rouge Steel made another retention payment up to a maximum of $7,000 per employee in December, 1992. *Id.* At least all deposed class members accepted this second retention payment as well.

### B. *FACTS IMPLICATED IN COUNT I.*

At the time of the sale, a number of class members unsuccessfully attempted to transfer to Ford pursuant to language in Ford's Supervisor Manual (hereinafter "Ford Manual" or "Manual"). This Manual was applicable to all of Ford's salaried employees for the entire period involved in this case, and provided, *inter alia:*

> The policies, practices, and procedures included in the statements of this Manual are subject to change without notice. Nothing in this manual is intended to create or constitute an employment agreement with any employee. All decisions by the Company as to the interpretation or application of such policies and all determinations of fact by the Company with respect to the application of such policies shall be final and binding upon the employees affected. The contents of this Manual shall not, under any circumstances, be deemed to be a part of any employment agreement with any employee. * * *
>
> A "termination" occurs whenever an employee is separated from the salaried employment rolls for any reason. The various types of terminations, which are discussed in detail in the following pages, are:
>
> * Quit

**2.** In a letter issued on December 14, 1989, Ford stated that it had developed a policy of placing employees at Ford if they were laid off by Rouge Steel following the sale to MAC. *See* Plaintiffs July 6, 1992, Brief in Opposition to Summary

> * Layoff
> * Retirement
> * Discharge
> * Death
> * Release
>
> \* \* \* · \* \* \*
>
> An employee may be "Released" from the Company for any of the following reasons:
> * At Company Option or Under Mutually Satisfactory Conditions * * *
> * Approved move to a subsidiary. * * *
>
> Employees who have been notified of their pending separation from the Company as a result of a reduction in force (layoff) are considered "available." *In certain circumstances, employees who are to be released may be made "available."* * * *
>
> Each staff or division must make every effort to place qualified "available" employees within the component before placement elsewhere in the Company is considered. Supervisors with position openings must consider such employees before looking outside the Company. Every reasonable effort must be made to place these employees in open positions with the same salary and comparable responsibility, or, if this fails, open positions paying at least 80% of the current salary.

Manual, pp. ii, 1000, 1001, 1009 (bold emphasis in original; underlining emphasis added).

The requests by those class members who sought a transfer under the Manual's placement policy quoted above were denied on the ground that the policy did not apply to them. *See* Plaintiffs' Brief, Exhibit 3.[2] Plaintiffs challenge this decision in Count I of their complaint.

### C. *FACTS IMPLICATED IN COUNT II.*

Important to Count II of Plaintiffs' complaint are the following facts: In 1981 and again in 1983, Defendants received wage and benefit concessions of an undetermined amount from Plaintiffs. Plaintiffs claim that

Judgment, Exhibit 6 (December 14, 1989 letter from J.C. Hausman, Vice President, Ford Employee Relations). However, this letter made no reference to the placement policy being otherwise in effect for Rouge Steel employees.

at the time the concessions were given to Ford, they received representations that the concessions would be returned upon better economic performance by Ford. *See* Defendants' Brief, Exhibit 3 (answers to Interrogatory #28). According to Plaintiffs, the sale of Rouge Steel to MAC unlawfully deprived them of the opportunity to make good on these representations.

### D. *FACTS IMPLICATED IN COUNT III.*

Just prior to the sale of Rouge Steel to MAC, Plaintiffs received a letter and attachment dated November 30, 1989, from J.C. Hausman, Ford's Vice President for Employee Relations ("Hausman letter"). The Hausman letter states:

> Marico plans to continue employment of virtually all Rouge Steel employees and to provide pay and benefits basically at levels you enjoy today. Generally, existing Rouge Steel salaried programs will continue following the sale. In some cases, separate plans will have to be established to reflect the change of ownership. Participation in Ford programs will continue on an interim basis until the new programs are in place. * * *
>
> Marico/Rouge Steel Company reserves the right to determine the terms of its plans and programs and the right to amend or terminate them at any time.

Hausman letter; attachment to letter, p. 4 (found in Defendants' Brief, Exhibit 4).

Since 1989, Plaintiffs have experienced some erosion of their employee benefits. *See* Plaintiffs' Brief, Exhibit 5 (notice that as of August, 1992, Rouge Steel would no longer pay for increases in optional life insurance premiums), Exhibit 6 (notice dated February 23, 1990, stating that Rouge Steel would not be providing a vehicle lease program), and Exhibit 7 (bulletin dated June 18, 1991, stating that Rouge Steel would temporarily suspend its matching contributions to the salaried employees savings plan). They have also not received wage increases in line with those granted by Ford since the sale. Defendants' Brief, Exhibit 3 (answers to Interrogatory No. 37). In Count III of their complaint, Plaintiffs claim that they should receive these lost benefits and other damages

because the representation in the Hausman letter above that Rouge Steel would provide them with basically the same benefits as they had before the sale was fraudulent.

### E. *FACTS IMPLICATED IN COUNT IV.*

Ford's General Retirement Plan ("GRP") gives the board of directors "the right at any time ... to amend, modify, or discontinue the Plan, or contributions thereunder, or the Retirement Fund." *See* Defendants' Correction Brief, Exhibit 4. Pursuant to this power, Ford amended the GRP along the lines set out in another part of the November 30, 1989 Hausman letter:

> **Pension Plan**—Marico intends to duplicate the provisions of the Ford General Retirement Plan (GRP) and to provide improved Noncontributory Benefits for some future years. The information below explains what happens to the retirement benefits earned before the sale, and also provides more detail on Marico/Rouge Steel Company salaried retirement benefits.
>
> *Benefits Earned Before Sale*—Ford will retain, in the GRP, the benefits accrued before sale for some employees, and will transfer benefit responsibility to the Marico/Rouge Steel Company salaried retirement plan for all other employees as follows:
>
> \* Employees eligible for Normal or Regular Early Retirement on the date of sale will continue to be eligible for a Ford retirement benefit when they retire from Marico/Rouge Steel Company. Ford will retain, in the Ford GRP, benefits accrued before sale for those eligible to retire at the time of sale.
>
> \* Employees also may *grow into* eligibility for Normal or Regular Early Retirement under the Ford GRP by meeting *both* conditions below:
>
> —*60 Points:* To be eligible for possible grow-in, an employee must have age (determined as of August 1, 1992) and service before sale with Ford/Rouge Steel which, when added together, total 60 or more points.
>
> —*Time-for-time:* For those not eligible to retire at the time of the sale but

having 60 points, the Ford GRP will recognize continued service with Marico/Rouge Steel Company—*not to exceed the length of service before the sale*—for determining eligibility to retire under the GRP. For example, those with 60 points and 10 years at sale generally could grow into Ford GRP retirement.

\* Ford will retain, in the Ford GRP, benefits accrued before the sale for those able to grow into Ford retirement. If termination occurs before grow-in has been completed, the GRP will provide a vested benefit, if eligible.

\* Completing grow-in means reaching, on the time-for-time basis, age 55 with 10 or more years of service, 30 years of service at any age, or age 65 with at least one year of service.

\* Benefits retained in the GRP for non-contributory service to date of sale will be based on the rates in effect for Ford salaried retirees on the date of termination from Marico/Rouge Steel Company.

\* Employees not eligible for or able to grow into a Ford retirement will have benefits earned before the sale, and related assets, transferred to the Marico/Rouge Steel Company plan.

*Benefits Earned After Sale*—Marico/Rouge Steel Company intends to duplicate the present provisions of the Ford GRP for service after the sale. There will be no interruption of employee contributions. Further, for noncontributory service following the sale and through July 1992, Marico/Rouge Steel will provide special supplements so that Noncontributory Benefits are the same as those in place for Ford employees at the time of sale.

*Service Recognition*—The Ford GRP and the Marico/Rouge Steel Company plan will recognize one another's credited service for the purpose of determining benefit eligibility (for example, eligibility to retire).

Hausman letter attachment, pp. 1–2 (emphasis in original).

The amendments spelled out in the Hausman letter were made to Ford's GRP at a Ford board of directors' meeting on January 11, 1990. The minutes to that meeting state:

## GENERAL RETIREMENT PLAN PROVISIONS FOR ROUGE STEEL SALARIED EMPLOYEES

For eligible Rouge Steel Salaried Employees who retire or break service on or after January 1, 1990 \* \* \*

SPECIAL ELIGIBILITY PROVISIONS TO RECEIVE BENEFITS FROM THE GRP. *Present:* Not applicable. *Proposed:* (1) Eligible to retire and receive a benefit from the GRP as of 12/15/89 or, (2) 60 or more points—age as of 8/1/92 added to company service on 12/15/89 and becoming eligible to retire within a period of Rouge service after the sale equal to length of Company service at time of sale.

SERVICE FOR PLAN ELIGIBILITY. *Present:* Not applicable. *Proposed:* Service at Rouge after the sale would be joined with GRP service prior to the sale to determine eligibility for retirement, the "30 and out" supplement and other plan provisions relating to service.

LIABILITY AND ASSET TRANSFER. *Present:* Not applicable. *Proposed: For employees not eligible to receive benefits from the GRP—liability for the projected benefit for service to 12/31/89 shall be determined and assets based on such liability will be transferred to the Rouge Salaried Retirement Plan to be established by the buyer.*

FINAL AVERAGE SALARY. *Present:* The average of the highest five consecutive December 31 monthly salaries during the past 10 years while making contributions. *Proposed:* Same, except that salaries at Rouge after the sale will be included in the calculation.

*See* Defendants' Correction Brief, Exhibit 2 (emphasis added).

With respect to benefits before the sale for those employees who did not have 60 points, the uncontested affidavit of William E. Hornberger, Vice President of Employee Relations at Rouge Steel, states:

As part of the sales agreement, Ford retained in its General Retirement Plan ("GRP") pension benefits earned before

the sale for salaried employees eligible for normal or regular early retirement on the date of the sale as well as for salaried employees whose age and service equalled 60 points (one year equalling one point). *The pension assets of salaried employees who did not meet either criteria were transferred to the Marico Rouge Steel Salaried Past Service Retirement Plan; more than sufficient assets to fund all liabilities for past service benefits were transferred. This Retirement Plan exists solely to provide benefits accrued before the sale. Benefits for service accrued after the sale are provided separately by a future service retirement plan.*

Defendants' Reply Brief, Exhibit 3 (emphasis added).

The actual transfer of assets did not take place until December 31, 1991. On that date, according to the uncontested affidavit of Bernard Kruszka, supervisor of Rouge Steel's Wage and Fringe Benefits Accounting Analysis Department:

pension assets in the amount of $4,343,918, including interest, were transferred from the Ford Motor Company General Retirement Plan ("GRP") to the Rouge Steel Company Salaried Employee Past Service Retirement Plan. Opinions of actuarial experts confirm that this amount is calculated to fully fund all vested pension obligations to Rouge Steel employees transferred out of the GRP pursuant to the "60-Point Plan," referred to in the Rouge Steel plan as "Group 3" employees.

*See* Kruszka Affidavit, p. 2.

The Plaintiff class, which is comprised of those Rouge Steel employees who did not have 60 points,[3] states that the amendments violate the terms of Ford's GRP in that they treat similarly situated employees dissimilarly. Plaintiffs' Second Amended Complaint, Count IV ¶ 10.[4] For this claim Plaintiffs rely upon the GRP's language establishing the powers of the GRP administrator:

The [Retirement] Committee shall administer the benefit structure of the Plan, and

to this end may construe the Plan, and may correct any defect or supply any omission or reconcile any inconsistency in such a manner and to such extent as it shall deem expedient to carry out the purpose of the Plan. *It shall not, however, take any action not uniformly applicable to all employees similarly situated.*

Defendants' Correction Brief, Exhibit 3 (emphasis added).

Plaintiffs also claim that, despite the affidavits of Mr. Hornberger and Mr. Kruszka, they have not received any information on whether Ford transferred to the Rouge Steel pension plan enough assets to cover benefits earned while they were still part of the Ford GRP. *See* Plaintiffs' Brief, p. 19. Finally, Plaintiffs complain that they were unlawfully denied the right to withdraw their contributions from the Ford GRP prior to the transfer of assets to Rouge Steel's pension plan. *Id.* at 24.

When Count IV is boiled down to its core, it is evident that Plaintiffs cry foul because they would prefer to have a Ford pension rather than a Rouge Steel pension. Indeed, the complaint itself states: "Plaintiffs and Class Members believe that because of insurance benefits, investment strategy and investment management, a Ford pension is more valuable than a Rouge pension." *Id.* at 19. Thus, through Count IV, Plaintiffs hope to undo the amendment of Ford's GRP and the subsequent transfer of assets to the Rouge Steel plan, and to ultimately receive a Ford pension.

## F. *FACTS IMPLICATED IN COUNT V.*

Defendants have not provided severance payments to Plaintiffs as a result of the sale of Rouge Steel to MAC. Plaintiffs claim that this benefit denial violates the terms of the Ford Manual, which states:

The Salaried Income Security Plan (SISP) consists of two benefits: (1) The Basic benefit provides income to employees who have one or more years of service and are

---

**3.** Some of the questionnaires Plaintiffs filled out, however, indicate that some of them did qualify for a Ford pension under the amendments. *See* Plaintiffs' Brief, Exhibit 3.

**4.** The Court notes that Plaintiffs challenge only the 60–point requirement in the amended Ford GRP; they do not contest the time-for-time provision.

laid off, released at Company option or under mutually satisfactory conditions, or retired at or after age 65 and are ineligible for noncontributory benefits under the General Retirement Plan; (2) The Supplemental benefit provides a guarantee of continued income to as late as age 62 for employees who are laid off with 15 or more years of service. Employees on the active roll on November 1, 1984, who are laid off as the *direct* result of a *future* plant closing and who have 10 or more years service on their last day worked, are eligible also for supplemental benefits.

Manual, p. 608 (found in Plaintiffs' Brief, Exhibit 8) (emphasis in original) (dated October, 1987).

A more detailed Ford policy statement on the SISP, which governed Rouge Steel employees until the 1989 sale, states:

> Section 2. Eligibility. Each regular salaried employee who shall have at least 12 months of Separation Allowance Service at the time of separation from employment with the Company and who shall have become separated from such employment due to:
>
> > (1) layoff, or
> >
> > (2) release at Company option or under mutually satisfactory conditions ..., or
> >
> > (3) retirement at or after age 65 when the employee is ineligible for noncontributory benefits under the General Retirement Plan because he lacks the required service,
>
> shall be eligible to receive a Separation Allowance as provided herein. * * *
>
> Section 6C. Persons Employed by Successor Corporation. If (i) an employee in a particular business or operation of the Company is released from employment with the Company because of the sale of such business or operation to another corporation, and (ii) such other corporation

shall offer employment to such employee at a base monthly salary equal to at least 80% of his base monthly salary received from the Company immediately preceding his release, such employee shall not be eligible for a Separation Allowance.

Defendants' Supplemental Exhibit 1.[5]

Finally, Plaintiffs were told in the November 30, 1989 letter from Mr. Hausman that they would not qualify for SISP benefits as a result of the sale of Rouge Steel to MAC. Instead, they were instructed that Rouge Steel would have its own SISP and that Ford would guarantee that SISP program up to a maximum of $2 million should Rouge Steel be unable to pay. *See* Hausman letter attachment, p. 4.

## IV. ANALYSIS

### A. THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions—*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[6] According to the *Celotex* Court:

---

**5.** Defendants originally provided the Court with a copy of a 1984 Ford policy with identical language to that quoted above. Upon review of that policy, however, the Court found that it stated that the Ford separation pay policy in effect on March 1, 1982, would govern Rouge Steel employees. *See* Defendants' Brief, Exhibit 7 § 27. The Court, therefore, requested defense counsel to provide the 1982 policy, quoted above.

**6.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright et al., *Federal Practice & Procedure*, § 2727, at 33 (Supp.1993).

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*See Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in deciding the Defendants' motion for summary judgment.

## B. PLAINTIFFS HAVE NOT DEMONSTRATED THAT A MATERIAL ISSUE OF FACT EXISTS WITH RESPECT TO COUNT I OF THEIR COMPLAINT.

### 1. *The Parties' Arguments.*

Defendants argue that Plaintiffs' claim that they had an implied contract to have positions "made available" for them within the Ford family upon application following the sale of Rouge Steel should fail for a number of reasons. First, by the clear terms of the Ford Manual, Plaintiffs were terminated from Ford in 1982 when they were transferred to a subsidiary—in this case the newly separated Rouge Steel. Thus, if any Ford placement rights accrued to Plaintiffs, they did so in 1982, not 1989. Second, Defendants argue that the implied contract principles of *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980), upon which Plaintiffs rely in their placement claim, have not and should not be extended to contexts other than discharge from employment. Third, even if *Toussaint* does apply to claims like Plaintiffs' alleged placement rights, the disclaimer at the front of the Manual should preclude a finding of liability on the part of Defendants. Fourth, even if the Manual did create a legitimate expectation in the existence of placement benefits, none of the Plaintiffs read or relied upon the Manual. Fifth and finally, even if the placement excerpt in the Manual did create some sort of expectation on which Plaintiffs relied, the Manual expressly states that released employees "may," not "shall," become "available" for placement at Ford. There is, therefore, no affirmative duty to make these employees "available" and to attempt to find them work at Ford.

Plaintiffs counter that the placement policy states that employees may be made available when "separated," not terminated, and that separation from Ford did not effectively take place until the 1989 sale of Rouge Steel to MAC. They also argue that *Toussaint* can and should apply to legitimate expectations of employee benefits and "perks" based on

employee manuals. Plaintiffs further argue that there was indeed reliance on the part of class members on the placement options outlined in the Manual—and that the Manual continued to govern Rouge Steel even after it was made into a separate corporation in 1982. Lastly, Plaintiffs argue that despite its "may" language, the Manual clearly indicates that employees who ask for transfers to Ford will be considered. Part of their placement claim is that Ford did not even review the requests of Rouge Steel employees to transfer to Ford during and after the negotiations to sell Rouge Steel to MAC.

### 2. *Although There Is A Material Issue Of Fact As To Whether The Ford Manual Continued To Apply To Plaintiffs After 1982, Count I Should Be Dismissed.*

■ As an initial matter, the Court holds that there is a material issue of fact on whether the Ford Manual continued to apply to Plaintiffs after the 1982 transfer from Ford Motor Company proper to Rouge Steel. Several pieces of evidence support the conclusion that the Ford Manual's placement language continued to apply in 1989 when Rouge Steel was sold to MAC.

First, the parties have entered into the following stipulation:

Upon transferring to Rouge Steel Company [in 1982], th[e] Plaintiffs and class members signed statements acknowledging that the terms and conditions of their employment with Rouge Steel Company would remain the same as they had been at Ford, except that wages and benefits might vary.

Joint Final Pre-trial Order ¶ 4B. Defendants, therefore, have admitted that to some extent they informed Plaintiffs that Ford policies would continue to apply past 1982.

Moreover, the Court notes two facts which indicate that Ford's personnel department and programs continued to govern Rouge Steel's employees after the 1982 transfer. First, the November 30, 1989 letter from J.C. Hausman describing the impact on employees of the sale of Rouge Steel is on Ford stationery and is from Ford's Vice President for Employee Relations. Similarly, it is undisputed that Ford continued to administer

the same retirement benefit plan for Ford and Rouge Steel until 1989. These two facts, when combined with the above stipulation, lead the Court to conclude that for the purposes of this motion, Plaintiffs' argument that the Manual's placement policy applied to them in 1989 as well as 1982 must be accepted as true.

■ The Court believes, however, that Plaintiffs cannot make out a *Toussaint* claim on the basis of the placement policy because of the disclaimer at the front of the Ford Manual. Plaintiffs correctly note that Michigan law has recognized that a breach of contract action exists when an employee does not receive severance pay to which he was entitled under an employer's policy manual following his termination. *See, e.g., Cain v. Allen Elec. & Equipment Co.,* 346 Mich. 568, 78 N.W.2d 296, ' 301–02 (1956) (affirming judgment that plaintiff was entitled to severance pay promised in employee manual under breach of contract theory because offer of severance pay was made in consideration of employee's continued service). However, even if this Court casts the placement policy as the equivalent of the severance pay in *Cain,* Michigan courts have also determined that a disclaimer like the one at the front of the Ford Manual extinguishes any *Toussaint* claim.

In *Rowe v. Montgomery Ward & Co., Inc.,* 437 Mich. 627, 473 N.W.2d 268 (1991), the Michigan Supreme Court confronted a case in which a discharged employee claimed, *inter alia,* that certain statements in her former employer's policy manual gave her a legitimate expectation that she could only be fired for cause. The most recent issue of that manual, however, contained the following clause:

Because business requirements fluctuate often in our industry, your employment conditions and status are subject to change at any time. Therefore, although you may have been hired for a specific position, with specified hours, pay, duties, etc., all of these can be reduced, increased, or, in fact, terminated without advance notice for any reason. Consequently, you also have the right to terminate your employment in the

same manner, at any time, for any reason. This lack of a guarantee or an employment contract also applies to other benefits, privileges and working conditions of employment at Montgomery Ward.

473 N.W.2d at 277. The Michigan Supreme Court concluded that this disclaimer eliminated any reasonable expectation the plaintiff could have had that her employment was not at-will. 473 N.W.2d at 277.

Similarly, in this case the Ford Manual quoted above specifically disclaims that it constitutes an employment agreement. Moreover, it states:

> The policies, practices and procedures included in the statements in this Manual are subject to change without notice.... *All decisions by the Company as to the interpretation or application of such policies and all determinations of fact by the Company with respect to the application of such policies shall be final and binding upon the employees affected.*

Manual, p. ii (emphasis added). Given the broad reservation of discretion to the employer in this disclaimer, the Court holds that as a matter of law the Plaintiffs could not have had a reasonable expectation that the placement policy, or any other provision of the Ford Manual, vested in them any kind of contract rights.

■ At oral argument, Plaintiffs asserted that the disclaimer found in the front of the Ford Manual should not apply to this case because Defendants have disregarded it in the past in their employee relations. According to Plaintiffs, Defendants encouraged employees to refer to the Manual to ascertain the last word on their employment rights.

As an initial matter, Plaintiffs did not provide the Court with any evidence that Defendants had departed from the Manual's dictates, including its disclaimer, during the course of Plaintiffs' employment with them. Even if Plaintiffs did provide such proof, the Sixth Circuit has held in a line of cases that employees cannot rely on post-disclaimer behavior to nullify such a disclaimer.

In *Duncan v. Rolm Mil–Spec Computers,* 917 F.2d 261 (6th Cir.1990), for example, the court faced a case in which at the time he

was hired a salesman signed an application for employment which contained an at-will disclaimer. The employee was later discharged as part of an economically motivated reduction in force. Despite the disclaimer, the plaintiff invoked written and oral statements made after he signed the application to establish that he had a just-cause contract. The relevant statements were made (i) in an employee manual given to plaintiff after he was hired, (ii) in a commission policy issued six years after he was hired, (iii) in a policy that employees had a 90–day "get well" period to improve sales if they were behind, and (iv) by a supervisor to the effect that plaintiff would not be fired if he continued to reach his quota. 917 F.2d at 262–63.

The court rejected the argument that these post-application events altered plaintiff's status as an at-will employee. The employee manual and commission policy statements were innocuous and merely indicated the employer's "optimistic hope" that the employment relationship would be mutually satisfactory. The court also held that the "get well" program was not inconsistent with at-will employment. Finally, the court held that because of the disclaimer, the employee could not reasonably have relied upon his supervisor's statement to alter his status as an at-will employee. The court therefore affirmed the district court's grant of summary judgment to the employer. 917 F.2d at 264. *See also Vollrath v. Georgia–Pacific Corp.,* 899 F.2d 533, 535 (6th Cir.1990) (written and oral representations allegedly contradicting at-will clause in employee manual given no effect), *cert. denied,* 498 U.S. 940, 111 S.Ct. 345, 112 L.Ed.2d 310 (1990); *Pratt v. Brown Mach. Co.,* 855 F.2d 1225, 1235 (6th Cir.1988) ("[At-will disclaimer] serves to negate the legitimacy of any expectation [plaintiff] had based on [a supervisor's post-hire] representations.").

Thus, it is well-established by the Sixth Circuit that, contrary to Plaintiffs' assertions, a disclaimer similar to the Ford Manual's which reserves to the employer the discretion to terminate employees or alter their terms and conditions of employment at any time is to be given effect despite subsequent conduct which might be inconsistent with the

disclaimer. Plaintiffs' argument that the Ford Manual's disclaimer is null and void because Ford never followed it is, then, rejected.

■ Even assuming, *arguendo,* that the Ford Manual created vested contract rights, the Court agrees with Defendants that the policy, as worded, did not bind Defendants to make Plaintiffs "available" for transfer to Ford. Under the terms of the Manual, Plaintiffs' terminations in 1989 from the Ford family of companies by virtue of Rouge Steel's sale to another employer can only be characterized as "releases at company option." Manual, p. 1011.[7] The placement policy clearly states with respect to released employees that: "In certain circumstances, employees who are released *may* be made 'available.'" Manual, p. 1001 (emphasis added). Defendants did not decide to make Plaintiffs available for transfer upon sale of Rouge Steel to MAC, and Plaintiffs have not brought to the Court any evidence showing that decisions as to who was and who was not to be made available for such transfers were not within Defendants' sole discretion. Plaintiffs argue that the terms of the policy compel the Defendants to make a good faith effort to implement it; however, they offer no legal or factual support for this assertion. The Court holds, therefore, that Defendants have complied with the Manual's placement policy, and summary judgment must be entered for them on Count I on this ground as well.[8]

■ Finally, neither party has cast Count I as a claim arising under ERISA's protection of employee benefit plans. Assuming they had, however, and assuming that the placement policy was, in fact, an ERISA plan, the Court believes that the outcome would be the same.

Under ERISA, this Court reviews a § 502 claim of improper denial of benefits under an "arbitrary and capricious" standard so long as the plan administrator reserves the right to interpret the plan; otherwise, a *de novo* standard of review applies. *See* 29 U.S.C. § 1132(a)(1)(B); *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109–113, 109 S.Ct. 948, 954–55, 103 L.Ed.2d 80 (1989). In this case, the Court will assume that the plan administrator of the placement policy was Ford's Employee Relations Office, which apparently issued the Manual. The Manual clearly reserves discretion in its application to the Employee Relations Office when it states: "All decisions by the Company as to the interpretation or application of such policies and all determinations of fact by the Company with respect to the application of such policies shall be final and binding upon the employees affected." Manual, p. ii. Therefore, the abuse of discretion standard spelled out in *Bruch* applies to Defendants' denial of placement benefits in this case.

■ Plaintiffs have not come forward with any evidence that the Employee Relations Office's decision that the placement policy did not apply to Plaintiffs was arbitrary and capricious. As noted above, at the time of Rouge Steel's sale, Plaintiffs were released. Furthermore, the Manual made placement of released employees in other Ford operations entirely permissive. Thus, the Office did not breach the placement policy when, in its discretion, it decided not to permit Rouge Steel employees to transfer to other Ford divisions. Plaintiffs have not presented any facts showing that non-Rouge Steel employees who requested transfers in similar circumstances received them. Absent this evidence, Plaintiffs' first count must be dismissed under ERISA as well as under *Toussaint.*

The Court draws support for its determination that the Employee Relations Office did not abuse its discretion from *Miller v.*

---

7. The Manual defines all forms of termination in explicit detail. They include: quit, layoff, retirement, disciplinary discharge, death, and release. Manual, pp. 1000–1011. It is undisputed that the Plaintiffs did not die, quit, retire, suffer disciplinary discharge, or get laid off. Therefore, on the facts presented, Plaintiffs can only be termed "released" by virtue of the 1989 sale of Rouge Steel to MAC.

8. The Court does not need to reach the issue of whether Plaintiffs read and/or relied upon the representations in the Ford Manual. It does note, however, that at least one class member read the placement clause and understood it. *See* Defendants' Brief, Exhibit 3 (Mr. Empel's responses to Interrogatories 21d and 22c).

*Metropolitan Life Ins. Co.*, 925 F.2d 979 (6th Cir.1991). In *Miller*, plaintiff was denied mental disability benefits by an insurance company, Metropolitan, which was vested with the authority to make benefit determination under her employer's plan. Pursuant to the plan, Metropolitan required plaintiff to have an independent examination of her disability. When this exam indicated that plaintiff could return to work, and plaintiff failed to bring forward evidence of continuing disability in order to qualify for benefits or at least to have a second independent exam, Metropolitan terminated her benefits. 925 F.2d at 981–82.

In describing the arbitrary and capricious standard, the Sixth Circuit reviewed relevant precedent:

> The court has stated that an ERISA benefit plan administrator's decisions on eligibility for benefits are not arbitrary and capricious if they are "rational in light of the plan's provisions." ... However, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor' [ ] in determining whether there is an abuse of discretion."

925 F.2d at 984 (citations omitted).

Although recognizing that Metropolitan did have a conflict of interest because it would pay out of its own assets any benefits to plaintiff, the court upheld its decision to deny benefits to plaintiff:

> The Plan's terms specify that provision of reasonably requested information is a condition precedent to the receipt of benefits and permit the company to require examinations and evidence at any point to demonstrate disability. Therefore, Metropolitan did not act unreasonably in refusing to reinstate benefits or schedule a second independent examination unless plaintiff first submitted further evidence of continuing disability. We find Metropolitan's actions in terminating plaintiff's disability benefits are consistent with a fair reading of the discretionary authority granted to the insurance company under the Plan and affirm the decision of the district court to

grant Metropolitan summary judgment on this issue.

925 F.2d at 985–86.

Likewise, in this case the Court believes that Ford's Employee Relations Office did not abuse the discretion granted to it to determine which Ford family employees could transfer to other divisions upon a release. As noted above, Plaintiffs have not offered any evidence to the contrary in the form of permitted transfers in similar circumstances. Thus, Count I must be dismissed.

## C. PLAINTIFFS HAVE NOT DEMONSTRATED THAT A MATERIAL ISSUE OF FACT EXISTS WITH RESPECT TO COUNT II OF THEIR COMPLAINT.

### 1. *The Parties' Arguments.*

Plaintiffs second cause of action is that by virtue of the 1989 sale of Rouge Steel they lost the opportunity to enjoy wage increases based on Ford's profitability in compensation for the unilaterally imposed wage concessions in 1981 and 1983. Plaintiffs admit in their complaint that this not a breach of implied contract claim. Second Amended Complaint, Count II ¶ 4.

Defendants argue that "lost opportunity" is not a cause of action under Michigan law. Furthermore, assuming the Plaintiffs allege promissory estoppel or tortious interference with a business relationship, they have not made out the elements of those claims. Moreover, the statute of limitations passed on Plaintiffs' lost opportunity claims because Ford was again profitable in 1983 and any lost wage increase claims accrued at that time. *See* Joint Final Pre-trial Order ¶ 4D. Finally, Defendants argue that Plaintiffs' claim is too speculative to award recovery under any theory.

Plaintiffs respond that lost opportunity is recognized as a tort. They also argue that the elements of promissory estoppel are met in this case. And they assert that since the injury they complain of did not take place until the sale of Rouge Steel, their claim is timely.

### 2. Count II Should Be Dismissed.

After reviewing the complaint and the parties arguments on how to characterize Count II, the Court believes that if Plaintiffs have any legally cognizable claim, it could only be one of promissory estoppel. Plaintiffs argue that they were promised benefits that did not materialize, and that this Court should now enforce that promise.

■ The elements of promissory estoppel are as follows:

(1) A promise (2) that the promisor reasonably should have expected to induce action of a definite and substantial character on the part of the promisee (3) which in fact produced reliance or forbearance (4) in circumstances which require that the promise be enforced if justice is to prevail.

*Parkhurst Homes v. McLaughlin,* 187 Mich. App. 357, 466 N.W.2d 404, 406 (1991).

■ Plaintiffs have presented evidence that Defendants indeed made a promise that concessions would be made up in future, profitable years. Defendants' Brief, Exhibit 3 (answers to Interrogatory # 28). Plaintiffs have not, however, offered any evidence that Defendants intended Plaintiffs to rely on these representations or that they in fact did so rely. Plaintiffs only *allege* in their complaint that "there was no revolt, strike, or other labor action and salaried personnel acquiesced in the wage concessions imposed on them ... in the belief that as things got better, they would be able to recoup their wage losses from concessions imposed upon them through wage increases." Second Amended Complaint, Count II ¶ 4. Plaintiffs offer no proof, however, that they dropped any ideas of resistance because of the promises they received, or that they even considered such resistance in the first place. They also have not shown that they did not look for other work because they expected the wage concessions would be made up in future years.

At summary judgment, Plaintiffs must come forward with *facts,* not mere allegations, in support of their claims. Because Plaintiffs have not offered any proof of reliance, their second count must be dismissed.[9]

9. The Court, therefore, does not need to address

■ As an alternative basis for its holding, the Court agrees with Defendants that Plaintiffs' claim is too speculative to permit recovery under any theory. In *Walker v. Consumers Power Co.,* 824 F.2d 499 (6th Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988), the Sixth Circuit affirmed the district court's grant of summary judgment for the employer on a *Toussaint* claim. The plaintiff in that case claimed that the employer violated its promise to him that he would receive "promotions and salary increases commensurate with his performance." 824 F.2d at 500. The court held that, "[s]uch statements indicate no more than what an employee may hope for if the employee remains with a company." 824 F.2d at 501–02 (footnote omitted). Therefore, they were "insufficient as a matter of law to give rise to an enforceable promise for a specific position or salary." 824 F.2d at 501.

The Court believes that the statements made to Plaintiffs that they would get back wage concessions that they made in the early eighties once Defendants returned to profitability were as nebulous as those in *Walker.* Defendants could have just as easily gone out of business. The statements, then, were merely expressions of hope for the future. Such is not the stuff that makes for recovery under promissory estoppel.

### D. PLAINTIFFS HAVE NOT DEMONSTRATED THAT A MATERIAL ISSUE OF FACT EXISTS WITH RESPECT TO COUNT III OF THEIR COMPLAINT.

■ Plaintiffs argue that Defendants committed fraud when they issued the Hausman letter containing the following statement: "Marico plans to continue employment of virtually all Rouge Steel employees and to provide pay and benefits basically at levels you enjoy today." Defendants argue that Plaintiffs have not made out the elements necessary for a misrepresentation claim. Defendants are correct.

Defendants' limitations argument.

In *Hi–Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813 (1976), the Michigan Supreme Court stated:

> The elements constituting actionable fraud or misrepresentation are well-settled in this jurisdiction. In *Candler v. Heigho*, 208 Mich. 115, 121, 175 N.W. 141, 143 (1919), we set forth those elements:
>
> > The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (3) that he made it with the intention that it should be acted upon by plaintiff; (4) that plaintiff acted in reliance upon it; and (5) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to recovery.

247 N.W.2d at 816.

Again, Plaintiffs have failed to develop a record permitting this Court to find a material issue of fact on their claim. Mr. Hausman's November 30, 1989 letter was clearly a material representation to the Plaintiffs. However, this is the only element which Plaintiffs can prove on this record. There is no evidence that the statement was false or reckless when made. Indeed, Plaintiffs admit that they have not suffered a wage loss, but only the lack of wage increases, since the date of sale. *See* Joint Pre-trial Order, ¶ 4C; Defendants' Brief, Exhibit 3 (answer to Interrogatory No. 37). This fact is not inconsistent with the 1989 statement that Marico intended to provide wages at "basically" the levels Plaintiffs enjoyed "today," i.e., *at the time of the sale.* Moreover, there is no evidence in the record that the erosion of other benefits identified by Plaintiffs was foreseeable in 1989. Even if they were foreseeable, the statement on which Plaintiffs rely must be read in the context of the entire 1989 letter and its attachment. The attachment clearly stated that: "Marico/Rouge Steel Company reserves the right to determine the terms of its plan and programs and the right to amend or terminate them at any time." Hausman letter attachment, p. 4. Thus, the letter and attachment themselves indicated that representations contained therein were not set in stone.

Even if the Court assumes that the statement on which Plaintiffs rely was intentionally false when made, there is again no evidence of reliance. Plaintiffs have failed to identify one of their members who would have left Rouge Steel or who would have engaged in organized resistance to the sale if it were not for the representations made in the November 30, 1989 letter. Absent this evidence, any fraud claim must fail.

Indeed, there is significant support for the conclusion that Plaintiffs in fact did not rely upon the Hausman letter when they stayed at Rouge Steel. First, several class members sought transfers to Ford under the placement policy discussed above. *See* Plaintiffs' Brief, Exhibit 3. This fact indicates they did not believe the Hausman letter and thought they would be better off by staying in the Ford family of companies. Second, the Court also notes that the retention payments Rouge Steel offered to Plaintiffs in 1989 and again in 1992 further undermine any possible finding of reliance. These payments each amounted to as much as $6,000 to $7,000 *per employee.* The retention payments, and their acceptance by class members, suggest to this Court that the more likely reason Plaintiffs stayed at Rouge Steel after 1989 was because it paid off immediately to do so, not because they were relying upon any representations that their compensation package would not change over the long run.

Plaintiffs have, therefore, not shown that there is a material issue of fact on whether Defendants misrepresented the facts to them in December, 1989. Summary judgment on Count III must be granted.

## E. PLAINTIFFS HAVE NOT DEMONSTRATED THAT A MATERIAL ISSUE OF FACT EXISTS WITH RESPECT TO COUNT IV OF PLAINTIFFS' COMPLAINT.

### 1. The Parties' Arguments.

Count IV of Plaintiffs' complaint alleges that the 60–point plan adopted by Ford to

determine which salaried employees would receive a Ford pension and which would receive a Rouge Steel pension violated the terms of the Ford GRP. Plaintiffs rely on a clause in the GRP that states that the plan administrator may not interpret the plan in such a way that would treat similarly situated employees dissimilarly. They assert that this is indeed what is happening because one worker at Rouge Steel will receive a Ford pension while the worker next to him will receive a Rouge Steel pension. Plaintiffs argue further that this result is unfair because, according to them, a Ford pension is more valuable than a Rouge Steel pension. Lastly, Plaintiffs argue that they were improperly denied the right to withdraw their contributions to the Ford GRP before that plan transferred assets including the contributions to the Rouge Steel pension plan.

Defendants counter that what really is at issue is not the GRP administrator's interpretation of Plan, but rather Ford's power to amend the Plan. That power, Defendants argue, is clearly provided under the GRP to Ford's board of directors. Furthermore, that power was properly exercised under ERISA because there is no evidence in the record that Ford did not transfer to the Rouge Steel plan sufficient assets to cover accrued benefits under the GRP for Rouge Steel employees who would not qualify for a Ford pension under the 60–point plan.

### 2. *Count IV Should Be Dismissed.*

As an initial matter, the Court agrees with Defendants that Plaintiffs have miscast their

ERISA-based claim. The 60–point plan was not a plan interpretation or series of decisions by the GRP administrator which would be reviewable by this Court under the *Bruch* "arbitrary and capricious" standard. Rather, the 60–point plan was a formal amendment of the GRP itself, one which left little interpretive discretion to the plan administrator. Indeed, Plaintiffs do not challenge how the GRP administrator has read the 60–point plan, but instead contest the legitimacy of the 60–point plan itself in the first instance.

Plaintiffs do not contest the procedures Ford took to amend its GRP to include the 60–point plan.[10] The question for this Court to review, then, is whether the amendment and subsequent transfer of assets complied with ERISA's substantive protections. To this issue the Court will now turn.

#### a. ERISA § 204(g).

The Court has been able to identify—unfortunately, without much assistance from counsel—two provisions of ERISA which govern Plaintiffs' challenge to the GRP amendment. The first, ERISA § 204(g), states:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan....

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in the regulations), or

**10.** At the hearing on this motion on December 21, 1993, the Court ordered Ford to provide the actual amendment language implementing the 60–point plan. Ford responded that the minutes of its board of directors' meeting held on January 11, 1990, constituted the amendment.

A review of those minutes demonstrated that the 60–point plan had yet to be reduced to actual plan amendment language. Furthermore, certain officers of the company were given discretion

to make such additions to, deletions from, or changes in amendments to such plan as may be necessary, appropriate or desirable (i) for the purpose of obtaining any ruling or determination letter from the Internal Revenue Service or (ii) to carry out the intent and to accomplish the purpose of the foregoing resolution.

*See* Defendants' Correction Brief, Exhibit 2.

In light of these facts, the Court was concerned that the Ford board minutes did not constitute a valid plan amendment. The Court, therefore, ordered a hearing for February 3, 1994, on this issue. Just prior to the hearing, however, the parties stipulated to the fact "that the resolution of the Ford Motor Company Board of Directors dated January 11, 1990, did have the effect of amending the Ford General Retirement Plan...." *See* Defendants' Brief in Support of Board Minutes, Exhibit 1. Because of the stipulation, the issue of whether an ERISA plan can be properly amended by rather nebulous resolutions passed by a board of directors is no longer before the Court.

(B) eliminating an optional form of benefit,

with respect to benefits *attributable to service before the amendment* shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.....

29 U.S.C. § 1054(g) (emphasis added).[11]

This Court has found only two cases in the Sixth Circuit which provide any guidance on how to interpret this section. In *Ross v. Pension Plan for Hourly Employees of SKF Indus.*, 847 F.2d 329 (6th Cir.1988), the court held that plant shutdown benefits did not fall within the protections of § 204(g). The court exhaustively defined the benefits protected under this section. First "accrued benefits" protected by § 204(g)(1) comprise of "annual retirement benefit[s] commencing at normal retirement age." 847 F.2d at 333 (quoting 29 U.S.C. § 1002(23)). Second, "early retirement benefits" are "generally benefits that become available upon retirement at or after a specified age which is below the normal retirement age, and/or upon completion of a specified period of service." 847 F.2d at 333. Third, an "optional form of benefit" is "generally one that involves the power or right of an employee to choose the way in which payments due to him under a plan will be made or applied." 847 F.2d at 333. Finally, the Sixth Circuit was unable to locate regulations defining "retirement-type subsidies," but did find legislative history indicating that they did not include plant shutdown benefits. 847 F.2d at 333–34.[12] Because plant shutdown benefits did not fall within any of the benefit categories protected by ERISA § 204(g), the district court's holding that the defendant plan did not violate ERISA by

denying plant shutdown benefits was affirmed. 847 F.2d at 330.

Similarly, in *Cattin v. General Motors Corp.*, 955 F.2d 416 (6th Cir.1992), the court held that ERISA § 204(g) permitted the denial of supplemental social security benefits to employees of EDS, a wholly-owned GM subsidiary. In 1984 when GM acquired EDS, it amended its retirement plan to exclude employees of wholly-owned subsidiaries acquired in 1984 or after. Plaintiffs transferred to EDS, and thus became no longer eligible to receive social security supplements provided under the GM plan to employees who had 30 years of service and who exercised early retirement prior to turning 62. Plaintiffs argued that the amendment eliminated an early retirement benefit in violation of ERISA § 204(g)(2). 955 F.2d at 422.

The court rejected this argument. First, the court noted that social security supplements were not "accrued benefits" protected by § 204(g)(1) because, in accord with the reasoning in *Ross, supra,* they were not benefits recoverable at normal retirement age under the plan. 955 F.2d at 423. The court then held that § 204(g)(2) did not apply because that section only protects early retirement benefits that are "attributable to service before the amendment." In the court's words:

In this case, social security supplements are not attributable to service which plaintiffs performed before GM amended the retirement plan because the plan stated that in order to receive the social security supplements, the employee must have acquired 30 years of credited service. Plaintiffs did not meet the prerequisites of the plan before the amendment. Therefore, even assuming arguendo that paragraph (2) creates some special definition of "ac-

**11.** The analogous provision in the Internal Revenue Code, I.R.C. § 411(d)(6), is virtually identical to that found in ERISA § 204(g).

**12.** The Court has also been unable to find any regulations defining retirement-type subsidies. One court, however, has so defined them to "represent[] benefits paid prior to normal retirement age without any actuarial reduction to reflect such early payment." *Lear Siegler Aerospace Prods. Holding Corp. v. Smiths Indus., Inc.*, 1990 WL 422417, *8, 1990 U.S.Dist. LEXIS 2887, *23

(S.D.N.Y.1990). *Lear Siegler* derived support for this definition from the legislative history to the Retirement Equity Act of 1984, which amended ERISA § 204(g): "As indicated by the Senate Report to the Retirement Equity Act of 1984, a benefit subsidy is nothing more than 'the excess of the value of a benefit over the actuarial equivalent of the normal retirement benefit.'" 1990 WL 422417, *8, 1990 U.S.Dist. LEXIS 2887, *23 (citation omitted).

crued benefits," that definition does not extend to benefits which are not attributable to service before the plan was amended. * * *

[I]n this case, the social security supplements are not an accrued benefit because plaintiffs did not meet the prerequisites under the plan for receiving the supplements before the amendment of the plan. [Section 204(g)(2) ] offers plaintiffs no relief from the plan amendment because they did not meet the conditions necessary to entitle them to social security supplements before GM amended the plan.

955 F.2d at 423–24 (footnote omitted). The court also drew support for its holding from an IRS regulation which indicated that social security supplements were not benefits protected under § 204(g). 955 F.2d at 424.

■ *Cattin* could be interpreted as teaching that if a participant does not qualify for early retirement benefits at the time the plan is amended, then those benefits are not "attributable to service before the amendment" and thus are not accrued benefits protected by § 204(g)(2). This reading of the statute cannot be correct, however. If it is, then an employer is free to amend a plan to eliminate early retirement benefits for those employees who have not yet qualified for them. Such a reading would defeat the purpose of § 204(g)(2) plain on the face of the statute, namely, to protect early retirement benefits for employees who had not yet qualified for them.

The Court must, therefore, look to other sources to interpret § 204(g)(2) as it may apply to this case. The Court has been unable to find any federal regulations which shed light on how the section should apply to this case. Fortunately, however, the legislative history to this section provides some useful guidance:

The bill provides that an amendment of a qualified plan is to be treated as reducing accrued benefits if, with respect to benefits accrued before the amendment is adopted, the amendment has the effect of . . . eliminating or reducing an early retirement benefit or a retirement-type subsidy. . . .

*The bill generally protects the accrual of benefits with respect to participants who* have met the requirements for a benefit as of the time a plan is amended and participants who subsequently meet the preamendment requirements. * * *

For example, consider a plan that provides an annual benefit of 1 percent of average pay per year of service at normal retirement age under the plan (age 65). The plan provides an early retirement benefit to a participant who has attained age 55. This early retirement benefit is actuarially reduced to 50 percent of the benefit payable to a participant at age 65. In the case of a participant who attains age 55 and who has completed 30 years of service, the amount of the annual benefit is not actuarially reduced under the plan.

Under the bill, if the plan is amended on January 1, 1985 (effective on that date), to require full actuarial reduction of early retirement benefits *in all cases,* then the full actuarial reduction could be made for any participant who severs employment before attaining age 55 and completing 30 years of service. Under the bill, however, if a participant met the age and service requirements for the unreduced early retirement benefit on January 1, 1985, then the plan amendment could not reduce the benefit below the level to which the participant would have been entitled if retirement had occurred immediately before the plan amendment was effective.

Under this plan, if a participant did not meet the plan's requirement for unreduced early retirement benefits on January 1, 1985, but the participant *later* satisfies those requirements, then the participant's accrued benefit under the plan would be the greater of (1) the accrued benefit as of the date of the plan amendment, without taking the actuarial reduction into account, or (2) the accrued benefit provided by the plan when the benefit becomes payable, after the full actuarial reduction. Accordingly, the participant's accrued benefit will not be reduced by the plan amendment, but it will not be increased by subsequent service or pay raises until the subsequent increase brings the participant's accrued benefit to a level in excess of the accrued benefit as of January 1, 1985.

The following examples illustrate the application of this provision.

Employee A was covered by the plan described above and, on January 1, 1985, was one day short of attaining age 55 and had completed 30 years of service. If A's average pay immediately before the amendment was $10,000, then A's accrued benefit at the time was an annual benefit of $3,000 ($10,000 × 1 percent × 30 years). A 50–percent actuarial reduction would reduce A's benefit payable beginning on January 1, 1985, to $1,500. Under the bill, the plan amendment could not reduce A's accrued benefit below $3,000 if A later attains age 55.

If as of January 1, 1985, employee B was age 50, had completed 25 years of service, and had average pay of $10,000, then the plan amendment could not reduce B's benefit below $2,500 ($10,000 × 1 percent × 25 years). If B's average pay increased by 6 percent annually until age 55, then B's accrued benefit at age 55 under the plan as amended would be $4,016 ($13,382 × 1 percent × 30 years). But for the bill and prior law, the actuarial reduction would reduce B's annual benefit to $2,008. Under the bill, the amendment could not reduce B's benefit payable at age 55 below $2,500.

If as of January 1, 1985, employee C was age 45, had completed 20 years of service, and had average pay of $10,000, and C's pay increased at 6 percent annually until age 55, then C's benefit would not be increased under the bill. C's accrued benefit as of January 1, 1985, was $2,000 ($10,000 × 1 percent × 20), and at age 55 (assuming average pay raises of 6 percent annually to $17,906) C's accrued benefit will be $5,371 ($17,906 × 1 percent × 30 years). The 50–percent actuarial reduction would reduce C's benefit to $2,685. The bill does not affect the result in C's case because the actuarial reduction does not reduce C's benefit below the protected level of $2,000.

S.Rep. No. 575, 98th Cong., 2d Sess. 28–29 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2574–75 (emphasis added).

The legislative history quoted above clearly indicates that Congress intended employees to be able to "grow into" early retirement benefits—equal to the amount of benefits attributable to pre-amendment service—spelled out in the pre-amended plan. A number of circuits have recognized this policy. For example, in *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137 (3d Cir.1993), the Third Circuit confronted a case in which an employer, Hoechst, sold a part of its operations, PVC Division, to American Mirrex Corporation. Plaintiffs were PVC employees who now worked for American Mirrex. Plaintiffs argued that Hoechst had transferred to American Mirrex insufficient assets to fund their early retirement benefits under the pre-sale Hoechst plan. Hoechst countered that (i) plaintiffs were not entitled to any early retirement benefits under the Hoechst plan because they did not meet the age and service requirements to qualify for them at the time of sale, and (ii) that Hoechst nonetheless transferred enough assets to cover any liability for early retirement benefits that they might owe to plaintiffs when they qualified for these benefits under Hoechst pre-sale plan in the future. The district court agreed with Hoechst that early retirement benefits for which plaintiffs were not yet qualified at the time of sale were not "accrued benefits" protected by ERISA § 204(g). The district court also noted that, should plaintiffs be entitled to early retirement benefits under the Hoechst plan in the future, it was a disputed issue of fact as to whether Hoechst transferred sufficient assets to American Mirrex to cover such claims. 4 F.3d at 1140, 1143, 1147.

The Third Circuit reversed. It held, first, that Hoechst's position that plaintiffs were no longer entitled to any Hoechst early retirement benefits because of the sale of PVC to American Mirrex amounted to an amendment of Hoechst's pension plan. 4 F.3d at 1144–47. *See also* 4 F.3d at 1150 (Alto, J., concurring). Second, the court held that plaintiffs were not separated from Hoechst's employment for purposes of accumulating age and service points towards qualifying for early retirement benefits provided in the pre-sale Hoechst plan by virtue of working for a successor employer. For this holding, the court relied upon various IRS rulings indicat-

ing that "an employee will be considered separated from service ... only upon the employee's death, retirement, resignation or discharge, and not when the employee continues in the same job for a different employer as result of liquidation, merger, consolidation, etc. of the former employer." 4 F.3d at 1146 (quoting Rev.Rul. 79–336, interpreting "separated from service" under I.R.C. § 402). Finally, the court concluded:

> We realize that, under ERISA, [Hoechst] can transfer [its] liability for early retirement benefits to the American Mirrex Early Retirement Plan.... However, to transfer [its] liability for early retirement benefits, [Hoechst] must transfer sufficient assets to the American Mirrex Retirement Plan to fund those benefits.... We note that [Hoechst] contend[s] that the "amount of funds transferred to [the American Mirrex Retirement Plan] was calculated to include the liability related to [Hoechst's] early retirement benefit[s]." ... However, as the district court correctly noted, whether [Hoechst] transferred sufficient assets to the American Mirrex Retirement Plan to fund the early retirement benefits is a disputed factual issue. The consequence of the resolution of this disputed factual issue is a matter for the district court in the first instance.

4 F.3d at 1147.

■ *Gillis*, then, stands for the proposition that if an employer with a pension plan sells a part of its operations, and also transfers a portion of the pension plan to the buyer, it must provide sufficient assets to cover accrued early retirement benefits of its former employees even if they have not yet qualified for those benefits. *See also Harms v. Cavenham Forest Indus., Inc.*, 984 F.2d 686, 692 (5th Cir.1993); *Aldridge v. Lily–Tulip, Inc.*, 953 F.2d 587, 590 (11th Cir.1992); *Adams v. LTV Steel Min. Co.*, 936 F.2d 368, 371 (8th Cir.1991) ("If a participant satisfies the pre-amendment conditions for a retirement-type subsidy, either before or after the amendment, the amendment is treated as

reducing accrued benefits."); *Hollingshead v. Burford Equipment Co.*, 809 F.Supp. 906, 917–18 (M.D.Ala.1992) (holding that employees working for a successor employer could still "grow into" early retirement benefits under the original employer's plan). *But see Meredith v. Allsteel, Inc.*, 11 F.3d 1354 (7th Cir.1993) (holding that early retirement benefits are not accrued benefits under ERISA § 204(g)). *Cf. Hunger v. The Pullman Co.*, 12 F.3d 118 (8th Cir.1993) (holding that employees who worked for a successor employer could no longer accrue credit towards early retirement subsidies under original employer's plan); *Lear Siegler Aerospace Prods. Holding Corp. v. Smiths Indus., Inc.*, 1990 WL 422417, 1990 U.S. Dist. LEXIS 2887 (S.D.N.Y.1990) (same holding as in *Hunger, supra* ).

■ After reviewing the statute, the legislative history, and the relevant case law, the Court holds that ERISA § 204(g) ensures that there is at least a minimum amount of a benefit which plan participants will receive if they have qualified, or eventually will qualify, for the benefit under the terms of the pre-amended plan. That minimum amount of benefit is calculated as of the time of the amendment and under the terms of the pre-amendment plan.[13]

How does this holding, then, apply to the facts of the instant case? It means that in order to challenge the 1990 Ford GRP amendment as violative of ERISA § 204(g), Plaintiffs must come forward with evidence that their pre-amendment rights in the plan were somehow decreased by the amendment. This, then, would require evidence that the assets transferred to the Rouge Steel plan pursuant to the amendment were insufficient to cover normal and/or early retirement benefits to which Plaintiffs were entitled at the time of the amendment—regardless of whether Plaintiffs had yet met the eligibility terms for those benefits on the date of the amendment.

Unfortunately for Plaintiffs, they have not met this burden. The Ford board minutes

---

**13.** To the extent that the Sixth Circuit may have held otherwise in *Cattin, supra,* the Court believes the ultimate decision in that case was still correct because of the IRS regulation cited by the court which stated that social security supplements were not protected by § 204(g). 955 F.2d at 424.

and the Kruszka affidavit quoted *supra*, Part II–E, indicate that Ford transferred assets to the Rouge Steel plan which were sufficient to cover *all* benefits earned as of December 31, 1989, by Rouge Steel employees who did not qualify for a Ford pension under the 60–point plan. Plaintiffs have not countered this statement with any evidence at all that the assets were not enough to fulfill the normal and early retirement benefits which Plaintiffs had accrued under the pre-amended plan immediately prior to the amendment. Thus, on the record as developed to date, Ford's modification of its GRP complied with ERISA § 204(g).[14]

### b. ERISA § 208.

Another section of ERISA, § 208, is also applicable to this case. It states:

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan ... unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).

29 U.S.C. § 1058.[15]

Regulations found in 26 C.F.R. § 1.414(I)–1 provide guidance on how to interpret this section. First, they define situations like the instant case, in which one retirement plan is broken into two, as the creation of a "spinoff" plan. 26 C.F.R. § 1.414(I)–1(b)(5). *See also United Steelworkers, Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 199 (6th Cir.1988). Next, the regulations state:

In the case of a spinoff of a defined benefit plan, the requirements of [ERISA § 208] will be satisfied if (i) All of the accrued benefits of each participant are allocated to only one of the spun off plans, and (ii) The value of the assets allocated to each of the spun off plans is not less than the sum of the present value of the benefits on a termination basis in the plan before the spin off for all participants in that spun off plan.

26 C.F.R. § 1.414(I)–1(n).

Applying the statute and the pertinent regulations to the facts of this case, the Court holds that as a matter of law Defendants have not violated § 208. Again, although Plaintiffs dispute that Defendants transferred enough assets to the new Rouge Steel plan to cover accrued benefits of Plaintiffs under the Ford GRP as of the December 31, 1991 transfer, there is no evidence of record to support this contention. Instead, there is only Mr. Kruszka's uncontested affidavit that on that date, "pension assets ... calculated to fully fund all vested pension obligations to Rouge Steel employees transferred out of the GRP pursuant to the '60-Point Plan' " were transferred to the Rouge Steel plan. Thus, had the Ford GRP terminated the day after December 31, 1991, Plaintiffs would have received the same benefits under that plan that they would have received if it had terminated the day before December 31, 1991.

The Court draws support for its holding from *Dougherty v. Chrysler Motors Corp.*, 840 F.2d 2 (6th Cir.1988). In that case, defendant Chrysler created a wholly-owned subsidiary named Chrysler Defense, Inc. ("CDI") in 1980. In early 1982, Chrysler transferred assets sufficient to cover accrued benefits to a newly created CDI pension plan. That same year, Chrysler sold CDI to General Dynamics Corporation. The sale included the transfer of assets and liabilities of

**14.** Plaintiffs may attempt to argue that the amendment, while complying with ERISA § 204(g), fails to fulfill the fiduciary duty requirements of ERISA § 404, 29 U.S.C. § 1104. However, the Sixth Circuit has held that § 404 does not apply to situations in which a plan is amended. *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 949–50 (6th Cir.1990), *cert. denied*, 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990).

Moreover, the Court is not troubled by the fact that there was an eleven day gap between the amendment of the Ford plan, January 11, 1990, and that amendment's effective date, December 31, 1989—the last day Plaintiffs accrued benefits under the Ford GRP. Plaintiffs did not challenge the (slight) retroactivity of the amendment, nor did they provide the Court with any evidence that they suffered any loss as a result of this retroactivity.

**15.** *See also* I.R.C. § 414(1) (analogous provision in the Internal Revenue Code).

the CDI pension plan. Accrued benefits of the CDI plan at the time of the sale equalled what they would have been under the Chrysler plan. 840 F.2d at 3.

Plaintiffs in *Dougherty* brought suit claiming that Chrysler breached its fiduciary duty to them by transferring the CDI plan without considering that the pension benefits at General Dynamics would not increase as they had at Chrysler since the sale. The court quickly disposed of this argument:

> We agree with the District Court that the sale of a business or portion does not impose a fiduciary duty on an employer to guarantee future, non-vested benefits. The future increases denied to plaintiffs were not vested. They were not part of the Chrysler Plan; rather they were, and are, voluntarily granted periodically by Chrysler.

840 F.2d at 3–4 (footnote omitted). The court added that there is no breach of fiduciary duty in the transfer of pension assets so long as the more specific provision in ERISA, § 208, was followed. 840 F.2d at 4. Because it was undisputed that at the time of sale Chrysler transferred sufficient assets to General Dynamics to cover accrued benefits, there was no violation of ERISA. 840 F.2d at 4.

Similarly, in *United Steelworkers, Local 2116 v. Cyclops Corp.*, *supra*, the Sixth Circuit held that defendant Cyclops Corporation did not violate ERISA § 208 when it transferred to New Boston Coke Corporation that portion of Cyclops' underfunded pension plan attributable to employees who worked for a part of its operations sold to New Boston. In that case, the parties stipulated to the accuracy of the actuarial computations made by Cyclops. Because Cyclops followed those computations in determining what amount to transfer to New Boston, the court concluded that Cyclops had complied with § 208. 860 F.2d at 200.

 As in *Dougherty* and *Cyclops*, the record as presented does not contain a material issue of fact on whether Ford met the requirements of ERISA § 208. Indeed, it appears that Ford transferred sufficient assets to cover all of Plaintiffs' accrued benefits under the GRP at the time of the transfer.

Thus, summary judgment for Defendants is proper under this section of ERISA as well.

**c. Inability to withdraw contributions.**

 Plaintiffs argue finally that Defendants unlawfully denied them the right to withdraw their pension contributions from the Ford GRP. Plaintiffs' Brief, p. 24. However, Plaintiffs cite no law, nor has this Court found any, giving pension plan participants an absolute right to withdraw their contributions from a pension plan. Plaintiffs have also failed to provide any facts that Ford denied them any withdrawal rights that they may have had under the Ford GRP— facts as simple as affidavits from Plaintiffs that they requested such withdrawals and were denied. In light of the complete absence of fact and law supporting recovery for Plaintiffs under this argument, summary judgment is proper.

**d. Conclusion.**

The Court would like to add at this point that in terms of retirement benefits it appears from the record that Plaintiffs are in no worse position by receiving a Rouge Steel pension instead of a Ford pension. Ford transferred to the Rouge Steel plan sufficient funds to cover all benefits accrued under the Ford GRP for employees that would not remain in the GRP. Rouge Steel, for its part, stated its intention to duplicate Ford's GRP for those employees with respect to benefits earned after the sale. *See* Defendants' Brief, Exhibit 4, p. 2. Moreover, Ford and Rouge Steel would give employees credit for time served with both companies. *Id.* at 3. Plaintiffs' only injury to date, then, is that they do not have a *Ford* pension, which they *perceive* to be better than a Rouge Steel pension. Plaintiffs offer no facts that the projected retirement benefits of employees with less than 60 points will be less than those with 60 points or more. Nor do they cite a case stating that ERISA or any other law remedies such a speculative injury. Indeed, at least one court has flatly rejected such a claim. *See Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*, 567 F.Supp. 1184, 1200 (N.D.W.V.1983) ("The Court believes

that ERISA cannot be perceived as requiring federal courts to weigh the potential success of one company as opposed to another when divestiture of a plant through sale to another entity is proposed."), *aff'd* 724 F.2d 406 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

Nothing in ERISA, then, bars the GRP amendment and subsequent transfer of assets as outlined in the 60–point plan. Pursuant to the amendment, then, the Ford GRP plan administrator can properly deny Plaintiffs a Ford pension because Plaintiffs are no longer similarly situated to their co-workers at Rouge Steel who will receive a Ford pension. Plaintiffs' pension count must be dismissed.

### F. *PLAINTIFFS HAVE NOT DEMONSTRATED THAT A MATERIAL ISSUE OF FACT EXISTS WITH RESPECT TO COUNT V OF PLAINTIFFS' COMPLAINT.*

#### 1. *The Parties' Arguments.*

■ Defendants argue that Count V should be dismissed because Plaintiffs were not, as a matter of law, terminated from Ford or Rouge Steel in 1989. In no way, then, could Plaintiffs qualify for separation benefits at that time. Moreover, Defendants argue that the SISP policy in effect at Ford in 1989 does not permit Plaintiffs to recover Basic SISP benefits because they were immediately reemployed by Rouge Steel at the same wages and benefits they were receiving before the sale.

Plaintiffs counter that the SISP policy to which Defendants refer was not distributed to class members, and, thus, Defendants should be estopped from relying upon it. Plaintiffs also argue that the inquiry into whether an employer has complied with its severance plan is fact-specific, and on these facts, summary judgment is not proper.

#### 2. *Count V Should Be Dismissed.*

The Court holds that summary judgment for Defendants on this count is appropriate. The parties agree that the SISP is a severance payment plan governed by ERISA. Defendants' Brief, p. 18. *See also Adams, supra,* 905 F.2d at 947 (6th Cir.1990) ("It is now well-established that severance benefit plans ... are welfare benefit plans."). As spelled out in the analysis of Count I, the Court must therefore look to see if the denial of severance benefits was arbitrary and capricious.[16] Such a determination, with respect to severance plans, "is a highly fact-specific inquiry in which precedent will often provide little guidance." *Adams,* 905 F.2d at 950 n. 3.

The Court has already held that a material issue of fact exists on whether the Ford Manual governed Rouge Steel in 1989. Furthermore, the Court has held that because of this material issue of fact, it would assume that Plaintiffs were "released at company option" from Ford by virtue of MAC's acquisition of Rouge Steel. *See, supra,* n. 7 and accompanying text. In addition, the Court notes that the Manual specifies that "The Basic [SISP] benefit provides income to employees who have one or more years of service and are ... released at Company option or under mutually satisfactory conditions...." Ford Manual, p. 608.

In spite of these findings, the Court believes that Ford's Employee Relations Office did not act arbitrarily in denying Plaintiffs SISP benefits. Defendants provided the Court with an SISP policy statement more specific than that found in the Ford Manual. That statement clearly provided:

> If (i) an employee in a particular business or operation of the Company is released from employment with the Company because of the sale of such business or operation to another corporation, and (ii) such other corporation shall offer employment to such employee at a base monthly salary equal to at least 80% of his base monthly salary received from the Company immedi-

---

16. Although it is unclear from the record, it appears that Ford's Employee Relations Office was the plan administrator for the SISP. *See* Manual, p. 608; Defendants' Exhibit 7, p. 1 § 1

(1984 SISP policy). Thus, the Court will treat the Employee Relations Office as the plan administrator in its analysis.

ately preceding his release, such employee shall not be eligible for a Separation Allowance.

Defendants' Supplemental Exhibit 1. In light of this provision, and the uncontested facts that Plaintiffs were immediately reemployed by Rouge Steel after its sale to MAC at their pre-sale salaries, Plaintiffs are not entitled to SISP benefits.

That Plaintiffs did not see the policies on which Defendants rely is irrelevant. It is true that the Employee Relations Office was under a duty to issue summary plan descriptions of its severance pay plan. *See* 29 U.S.C. §§ 1021, 1022. For the purposes of this motion the Court will accept that Defendants failed to distribute the documents on which they rely. Nonetheless, the Sixth Circuit has held that such a failure is not a *per se* violation of ERISA to which estoppel attaches.

In *Franklin v. Pitney Bowes, Inc.,* 919 F.2d 45 (6th Cir.1990), the court confronted a case in which severance benefits set forth in a oral policy were denied. The Court analyzed plaintiffs' estoppel argument in the following terms:

> Plaintiffs also contend that the company should be estopped from claiming that they were not entitled to severance pay or, at least, that terms of the plan should be interpreted strictly against the company because it failed to set out the plan in writing and provide its employees with summaries of the plan as required by ERISA.... While a court evaluating the conduct of a plan administrator under the *de novo* standard will take into account instances of this nature where an administrator fails to follow one of ERISA's procedural requirements, we are unwilling to say that such a failure should be held to constitute a *per se* violation of ERISA. Instead the nature and the consequences of a failure to follow required procedures should be evaluated under a totality of circumstances.

919 F.2d at 48. The court continued:

> Here, our job is indeed complicated by the administrator's failure to reduce the plan

to writing, but there is no indication that [defendant's] failure in this regard was the product of bad faith, nor does it appear that [defendant] attempted to shirk its responsibilities under the terms of the plan.... Accordingly, estoppel is too severe a sanction.

919 F.2d at 48 (footnote omitted). *See also Gillis, supra,* 4 F.3d at 1141 ("However, standing alone, the fact that a separation pay policy document was not distributed to the employees is 'irrelevant in determining entitlement to benefits.'") (citation omitted).

The Court agrees with *Franklin* and *Gillis* that an employer's failure to distribute a plan policy is not a *per se* violation of ERISA which would prevent that employer from introducing the policy as a basis for its denial of separation benefits. Here, as in *Franklin* there is no showing of bad faith by Defendants; it is not as if they concealed documents until this litigation arose or even fabricated them as was alleged in *Gillis.*[17] The Court does not believe, then, that there is sufficient grounds for not relying on Ford's severance policies as found in the record for this case.

At the hearing, Plaintiffs offered a second argument why the successor clause in the severance pay policy relied upon by Ford should not apply. Plaintiffs' counsel suggested that MAC/Rouge Steel was not a successor employer to Ford/Rouge Steel because Plaintiffs' employer, Rouge Steel, did not change. The Court notes that if Plaintiffs' employer did not change in 1989, then they were not "released"—a prerequisite for receiving severance benefits. Furthermore, Plaintiffs cannot rely on their transfer from Ford's employment rolls in 1982 to Rouge Steel's to qualify for severance benefits. Any claims based on activity in 1982 are time-barred. *See, e.g., Hebein v. Ireco, Inc.,* 827 F.Supp. 1326, 1329 (W.D.Mich.1993) (applying six-year Michigan breach of contract limitations period to ERISA § 502 claim).

Lastly, Defendants correctly note that in all of the cases on which Plaintiffs rely to show that they are entitled to severance ben-

---

**17.** In that case, the court still relied on the undistributed plan documents despite plaintiffs' allega-

tion of fabrication and circumstantial evidence supporting it. *Gillis,* 4 F.3d at 1141.

efits, the plans did not include a successor employer clause like the Ford provision. *See* Plaintiffs' Brief, pp. 29–30, and cases cited therein. Summary judgment for Defendants on Count V is, therefore, appropriate.

## V. *CONCLUSION*

For the foregoing reasons,

IT IS HEREBY ORDERED that summary judgment is GRANTED to Defendants on all counts. Judgment shall be entered accordingly.